DOMENIC CORSETTI & another[1] *vs.* THE STONE COMPANY
& another.[2]

Middlesex. December 6, 1984. — September 19, 1985.

Present: HENNESSEY, C.J., WILKINS, LIACOS, ABRAMS, NOLAN, LYNCH, & O'CONNOR, JJ.

*Negligence*, Contractor, Construction work, Manufacturer, Scaffolding. *Administrative Law*, Regulations. *Evidence*, Failure to produce witness, Income from collateral source. *Practice, Civil*, Failure to make discovery.

In an action against the general contractor on a construction project by a subcontractor's employee, who had been seriously injured in a fall resulting from failure of a scaffolding side bracket supporting the platform on which he was working, the jury could properly conclude that the general contractor owed the employee a duty to exercise reasonable care for his safety, where, on the evidence presented at trial, they could have found that the contract between the general contractor and the building owner assigned to the general contractor the responsibility to initiate, maintain, and supervise "all safety precautions and programs in connection with the Work"; that, under the terms of the contract between the general contractor and the plaintiff's employer, the general contractor retained the authority and control necessary to carry out that responsibility; and that the general contractor's supervisor at the job site had authority to remedy safety violations by subcontractors, had exercised this authority by checking to see whether scaffolding was properly set, had discussed safety precautions and procedures with the foreman of the plaintiff's

---

[1] Margherita Corsetti.

[2] Deal Products, Inc.

employer, and was aware that the employees of that subcontractor were not using safety belts while working on the scaffolding. [5-12]

In an action against the general contractor on a construction project by a subcontractor's employee, who had been seriously injured in a fall resulting from failure of a scaffolding side bracket supporting the platform on which he was working, the evidence was sufficient to warrant the jury in finding that the general contractor had failed to exercise reasonable care for the plaintiff's safety. [12-14]

At the trial of a negligence action against a building contractor, the judge was not obliged to give, in the form requested, a jury instruction regarding the significance of evidence of custom and practice in the construction industry. [14-15]

The defendant in a negligence action was not entitled to have the jury instructed in terms which focused on lost earnings, as contrasted with lost earning capacity, as a measure of damages. [15]

In an action to recover damages for personal injuries, the defendant was not entitled to have the jury instructed that they could properly draw an adverse inference from the plaintiff's failure to call his treating physician as a witness, where the defendant itself had called the physician, and he had testified. [15-16]

In the circumstances of an action against the general contractor on a construction project by a subcontractor's employee, who had been seriously injured in a fall resulting from failure of a scaffolding side bracket supporting the platform on which he was working, the defendant was entitled, as of right, to the admission of evidence that, since the accident, the plaintiff had been receiving income from various sources, including social security and workers' compensation benefits, in excess of his pre-accident income, where evidence of the plaintiff's collateral-source income was relevant to his motive for staying out of work and was directly contradictory of the plaintiff's testimony, elicited from him on direct examination, focusing on his lack of money as a result of his injuries. [16-21] LIACOS, J., and ABRAMS, J., dissenting.

In an action by a construction worker who had been seriously injured in a fall resulting from failure of a scaffolding side bracket supporting the platform on which he was working, the judge correctly ordered judgment n.o.v. in favor of the alleged manufacturer of the scaffolding, where there was no evidence from which the jury reasonably could have found that the failure of the bracket was more likely caused by the negligence of the manufacturer than by intermediate mishandling or faulty repairs. [21-25]

The judge in a civil action retained discretion to impose sanctions against a party for wilful failure to comply with a request under Mass. R. Civ. P. 34 for production of documents even though the opposing party later acquired the information it had sought [25-26]; however, in the absence of argument addressed to the issue, this court did not consider whether

a fine payable to the trial court would be a permissible sanction under Mass. R. Civ. P. 37(d) [27].

CIVIL ACTION commenced in the Superior Court Department on March 9, 1979.

The case was heard by *Thomas R. Morse, Jr.*, J.

The Supreme Judicial Court granted a request for direct appellate review.

*Thomas D. Burns* (*John J. McGivney* with him) for The Stone Company.

*Frederic N. Halstrom* (*Peter A. Donovan* with him) for the plaintiffs.

*Allen N. David & Alexander H. Pratt, Jr.*, for Deal Products, Inc.

*Jeffrey F. Jones, Steven L. Schreckinger & R. Lisa DiLuna*, for Scaffold Industry Association, amicus curiae, submitted a brief.

O'CONNOR, J. Domenic Corsetti (Corsetti), a stone mason employed by the R.A. Salvucci Construction Company, Inc. (Salvucci), was seriously injured when a scaffolding side bracket supporting the platform on which he was working failed and he fell approximately forty feet to the ground. He brought this action against The Stone Company (Stone), the general contractor at the construction site where he was injured, and Deal Products, Inc. (Deal), a manufacturer of scaffolding products. His complaint alleged that Stone had negligently failed to require workers on the construction project to use appropriate safety equipment. The complaint also alleged that Deal had negligently designed, manufactured, and marketed a dangerous side bracket; that Deal had negligently failed to warn consumers of the dangerous character of the bracket; and that Deal had breached the implied warranty of merchantability. Margherita Corsetti, Corsetti's wife, also brought claims against the defendants for loss of consortium.[3] The defendants denied liability and cross claimed against each other for contribution.

---

[3] Claims for loss of society brought by Margherita Corsetti's three children were apparently dropped prior to trial.

A jury found that both Stone and Deal had been negligent, but that Deal had not breached the implied warranty of merchantability. They found that no negligence on Corsetti's part contributed to his injuries, and they assessed damages in his favor in the sum of $840,000 and in Margherita's favor in the sum of $25,000. Both defendants filed motions for judgment notwithstanding the verdict, and for a new trial. The trial judge denied Stone's motions. The judge allowed Deal's motion for judgment notwithstanding the verdict, denied Deal's motion for a new trial, and granted judgment for Deal on Stone's cross claim. Stone appeals from the judgments against it on the plaintiffs' claims and on its cross claim against Deal. The plaintiffs appeal from the judgment against them in favor of Deal, and they appeal from the denial of their motion for sanctions against Stone for its failure to comply with discovery. Deal appeals from the denial of its motion for a new trial. We granted the plaintiffs' application for direct appellate review.

On appeal, Stone argues that the trial judge erred in denying its motion for judgment notwithstanding the verdict. Stone also argues that the judge erred in excluding evidence of the plaintiffs' collateral source income, and in failing to give certain requested instructions to the jury. We conclude that there was sufficient evidence to warrant a finding that Stone was liable to the plaintiffs and that the trial judge properly denied Stone's motion for judgment notwithstanding the verdict. We also find no reversible error in the judge's charge. We conclude, however, that the judge's exclusion of evidence of collateral source income was error and that Stone is entitled to a new trial limited to the question of the plaintiffs' damages.

The plaintiffs and Stone argue that the trial judge erred in granting Deal's motion for judgment notwithstanding the verdict. Deal argues that the judge should have granted its motion for a new trial because the verdicts on the negligence and breach of warranty counts were inconsistent. We conclude that there was insufficient evidence to warrant a finding that Deal was liable to the plaintiffs and that the trial judge properly granted Deal's motion for judgment notwithstanding the verdict. We therefore do not consider whether it was error to deny

Deal's motion for a new trial. Finally, we affirm the denial of the plaintiffs' motion for sanctions against Stone.

1. *Stone's motion for judgment notwithstanding the verdict.* In support of its contention that it is entitled to judgment notwithstanding the verdict, Stone argues that, as the general contractor, it had no duty to the employees of Salvucci other than to provide a reasonably safe place to work, that it cannot be held vicariously liable for any injuries resulting from Salvucci's negligence in failing to instruct Corsetti on proper safety precautions, and that, as a matter of law, the safety regulations introduced in evidence by the plaintiffs did not apply to the facts of this case.

We summarize the evidence relevant to Stone's liability, viewed in the manner most favorable to the plaintiffs. In 1977, Computervision Corporation contracted with Stone for the construction of two buildings at the Computervision facilities in Bedford. Stone in turn contracted with Salvucci to perform the masonry work called for by the project. Corsetti, an experienced stone mason, was employed by Salvucci to work on the Computervision project. A stone mason's duties included laying and mortaring cement blocks in the construction of masonry walls. Much of this work was performed on scaffolding erected alongside the wall being constructed. The masons would work on a platform located between the main frame of the scaffolding and the wall being constructed. The platform consisted of boards or planks supported by triangular-shaped pieces of scaffolding called side brackets or outriggers. The side brackets hooked onto the side of the main frame of the scaffolding, and extended to within approximately one inch of the wall being built.

On September 26, 1978, Corsetti was working on the construction of an elevator shaft in one of the buildings. The platform on which he was working was between thirty-six and forty feet above the ground. One of the side brackets supporting the platform gave way, causing him to fall. He sustained serious injuries, including fractures of the right arm, leg, and ankle, facial lacerations, and back and head injuries. Corsetti was not wearing a safety belt when he fell, nor was he provided with

such a belt or instructed to use one. There was no safety net beneath the platform to break his fall.

The general contract between Computervision and Stone provided that Stone, as general contractor, was responsible for initiating, maintaining, and supervising job site safety, and was to comply with all applicable safety regulations.[4] The subcontract between Stone and Salvucci provided that Salvucci was to take all reasonable safety precautions with respect to its work, and to comply with safety measures initiated by Stone and with all applicable safety rules and regulations.[5]

There was evidence from which the jury could have found that the custom in the trade was that subcontractors would be responsible for their own equipment and needs, but that they would take direction from the general superintendent on the job. Thomas Burke, a Stone employee, was the general superintendent on the Computervision project. Burke, together with William O'Neill, Stone's project manager, was responsible for

---

[4] Article 10 of the general contract provided in part:

"10.1  SAFETY PRECAUTIONS AND PROGRAMS
"10.1.1  The Contractor shall be responsible for initiating, maintaining and supervising all safety precautions and programs in connection with the Work.
"10.2  SAFETY OF PERSONS AND PROPERTY
"10.2.1  The Contractor shall take all reasonable precautions for the safety of, and shall provide all reasonable protection to prevent damage, injury or loss to:
".1  all employees on the Work and all other persons who may be affected thereby;
"  . . . .
"10.2.2  The Contractor shall give all notices and comply with all applicable laws, ordinances, rules, regulations and lawful orders of any public authority bearing on the safety of persons or property or their protection from damage, injury or loss."

[5] Article 11 of the subcontract provided in part:

"11.7  The Subcontractor shall take all reasonable safety precautions with respect to his Work, shall comply with all safety measures initiated by the Contractor and with all applicable laws, ordinances, rules, regulations and orders of any public authority for the safety of persons or property in accordance with the requirements of the Contract Documents. The Subcontractor shall report within three days to the Contractor any injury to any of the Subcontractor's employees at the site."

initiating, maintaining and supervising all safety precautions and progress on the project. The only safety program in place on the Computervision project was a requirement of compliance with OSHA rules and regulations. Burke testified that it was his responsibility to enforce those rules with regard to employees of subcontractors as well as employees of Stone. He had the authority and responsibility to require subcontractors to correct any unsafe practices or violations of the safety regulations. He also testified that he had inspected the scaffolding to see that it was set properly and to look for obvious deficiencies, although he never inspected the side brackets supporting the masons' platform. If he saw any safety violations, he would instruct the subcontractor to correct them. Burke conducted informal meetings with the subcontractor's foremen, at which safety requirements were discussed. Neither Burke nor O'Neill ever instructed Salvucci to require masons working on scaffolding to wear safety belts or to install safety nets below the scaffolding. There was evidence that safety belts and lines were commonly used by masons, but that they were not commonly used under the conditions in which Corsetti was working because he was protected by the masonry wall on one side and the main frame of the scaffold on the other. However, the plaintiffs' expert witness, a safety consultant, testified that in his opinion good safety management and administration dictated the use of safety belts under those conditions. He testified that the use of a safety net would not have been feasible because there was no place to put one, but the use of a safety belt and line was both feasible and practical under those conditions. He further testified that the belt could be tied in such a way as to pose no danger to the mason of tripping, and that the cost of providing such a belt would be approximately thirty-five dollars.

Stone's expert, an engineer, testified that a safety belt was not appropriate for masons under the circumstances of the case because there was no hazard of falling, and because a belt and line would pose a hazard of tripping. He further testified that the classic situation in which a safety belt would be used is when there is a hanging scaffold; in other words, a scaffold

platform suspended against a building by two cables. He said that a safety belt was required on such a scaffold because if one·of the cables broke, everyone and everything on the platform would fall.

The plaintiffs introduced in evidence a copy of Industrial Bulletin No. 12, Rules and Regulations for the Prevention of Accidents in Construction Operations, Department of Labor and Industries, Division of Industrial Safety, Commonwealth of Massachusetts (hereinafter Industrial Bulletin No. 12).[6] That bulletin contained the following provisions:

"4.6 *Falling Hazards.*

"4.6.1 *Prevention* — Every hole or opening in floors, roofs, walls, elevated platforms and similar operating surfaces into or through which a person may fall shall have all exposed sides guarded by a barrier sufficient to prevent falls.

"4.6.2 *Temporary Floors* — Where free access is required by work actually in progress, floor openings shall be covered by solid temporary construction conforming to the requirements of Section 11.5.

"4.6.3 *Floor Security* — When covering floor openings by means of solid temporary construction such cover shall be properly anchored to prevent accidental displacement.
"....

"4.16 *Use of Protective Equipment.*

"4.16.1 *Required Use* — A life line and safety belt or life net, as appropriate, shall be provided for and used by workmen engaged in the following operations:

1. Securing or shifting thrustouts.
2. Inspection or working on overhead machines, supporting scaffolds or other high riggings.

---

[6] The regulations contained in Industrial Bulletin No. 12 were formally promulgated on January 1, 1978, 441 Code Mass. Regs. 10.00 et seq. The provisions set forth above are found at 441 Code Mass. Regs. 10.04(6) and 441 Code Mass. Regs. 10.04(16), respectively.

3. Steeply pitched roofs.
4. Employees exposed to the hazard of falling more than twenty-five (25) feet above land, or temporary or permanent floor.
5. Employees exposed to the hazard of falling more than fifty (50) feet above water.
6. Working in confined space as defined in Section 20.
7. As directed by his employer or his employer's authorized agent."

The plaintiffs also introduced a booklet entitled "Construction Industry, OSHA Safety and Health Standards Digest, U.S. Department of Labor Occupational Safety and Health Administration, (Revised) June 1975." The booklet is a digest of selected OSHA standards, expressed in simple terms, to aid employers, supervisors, and safety personnel in achieving voluntary compliance with OSHA standards.

We agree with Stone's contention that the relationship of Stone and Salvucci was not that of master and servant and that therefore Stone cannot be held vicariously liable for the negligence of Salvucci or its employees. *Whalen* v. *Shivek,* 326 Mass. 142, 149-150 (1950); *Herrick* v. *Springfield,* 288 Mass. 212, 216 (1934). However, we do not agree with Stone's further argument that as the general contractor on the job, it owed no duty to employees of subcontractors other than a general duty to provide a reasonably safe worksite and to warn of defects which it reasonably could have discovered on the worksite or in appliances already in place there. We do not agree that as a matter of law Stone owed no duty to Corsetti to require that he use safety equipment.

Stone was the employer of Salvucci, an independent contractor. "[A]part from any question of vicarious responsibility, [an] employer [of an independent contractor] may be liable for any negligence *of his own* in connection with the work to be done . . . . So far as he in fact gives directions for the work, furnishes equipment for it, *or retains control over any part of it,* he is required to exercise reasonable care for the protection

of others" (emphasis added). W. Prosser, Torts § 71, at 469 (4th ed. 1971). If the employer retains no control over the manner in which the work is to be done, "it is to be regarded as the contractor's own enterprise, and he, rather than the employer, is the proper party to be charged with the responsibility of preventing the risk, and bearing and distributing it." Restatement (Second) of Torts § 409 comment b (1965).[7] However, if the employer retains the right to control the work in any of its aspects, including the right to initiate and maintain safety measures and programs, he must exercise that control with reasonable care for the safety of others, and he is liable for damages caused by his failure to do so. This principle is set forth in Restatement (Second) of Torts § 414 (1965), which provides: "One who entrusts work to an independent contractor, but who retains the control of any part of the work, is subject to liability for physical harm to others for whose safety the employer owes a duty to exercise reasonable care, which is caused by his failure to exercise his control with reasonable care."

One, such as Stone, who employs an independent contractor, "may retain only the power to direct the order in which the work shall be done, or to forbid its being done in a manner likely to be dangerous to himself or others. Such a supervisory control may not subject him to liability under the principles of Agency, but he may be liable under the rule stated in [§ 414] unless he exercises his supervisory control with reasonable care so as to prevent the work which he has ordered to be done from causing injury to others." *Id.* comment a. "The rule stated in [§ 414] is usually, though not exclusively, applicable when a principal contractor entrusts a part of the work to subcontractors, but himself or through a foreman superintends the entire job. In such a situation, the principal contractor is subject to liability if he fails to prevent the subcontractors from doing even the details of the work in a way unreasonably dangerous to others, if he knows or by the exercise of reasonable care should know that the subcontractors' work is being so done,

---

[7] A stricter standard may apply in cases involving inherently dangerous work. See *Herrick* v. *Springfield, supra* at 216-217. Restatement (Second) of Torts §§ 414A, 416, 417, 423 (1965).

and has the opportunity to prevent it by exercising the power of control which he has retained in himself." *Id.* comment b.

Whether an employer has sufficient control over part of the work of an independent contractor to render him liable under § 414 is a question of fact for the jury. *Hammond* v. *Bechtel Inc.*, 606 P.2d 1269, 1275 (Alaska 1980); *Rabar* v. *E.I. duPont de Nemours & Co.*, 415 A.2d 499, 507-508 (Del. Super. 1980). If there was sufficient evidence to support a finding that Stone retained control over the safety aspects of the Computervision project, Stone was not entitled to judgment notwithstanding the verdict on the theory that it owed Corsetti no duty of reasonable care. See *Byrd* v. *Merwin,* 456 Pa. 516, 520 (1974); *Pasko* v. *Commonwealth Edison Co.,* 14 Ill. App. 3d 481, 489 (1973).

Based on the evidence presented at trial, the jury could have found that under the terms of Stone's contract with Computervision, one of Stone's responsibilities was to initiate, maintain, and supervise "all safety precautions and programs in connection with the Work," and that under the terms of its subcontract with Salvucci, Stone retained the authority and control necessary to carry out that responsibility.[8] The jury further could have found that Burke, Stone's supervisor at the job site, had the authority to direct subcontractors to remedy violations of safety rules and regulations and to stop work if they failed to comply; that Burke in fact exercised his authority in checking to see whether scaffolding was properly set; that Burke had discussed safety requirements and procedures with Salvucci's foreman; and that Burke was aware that Salvucci's masons were not using safety belts while working on the scaffolding.

---

[8] Stone correctly argues that the terms of its contract with Computervision cannot vary or heighten any duty Stone may have owed to Corsetti. *Kushner* v. *Dravo Corp.,* 339 Mass. 273, 276-277 (1959); *Hampson* v. *Larkin,* 318 Mass. 716, 718 (1945). However, the contract is relevant as evidence of control over the safety aspects of the work. In addition, the contract specified that Stone was to comply with Federal and State safety regulations. As such, it provides evidence of the standards the parties considered to be material to due care under the circumstances. *Kushner* v. *Dravo Corp., supra* at 277. *Hampson* v. *Larkin, supra.*

From those findings, the jury could have concluded that Stone had the ability and opportunity to prevent the work from being performed in a dangerous manner by the exercise of the power of control it retained. There was sufficient evidence to support a finding that Stone owed Corsetti a duty to exercise reasonable care for his safety.

We turn to the question whether the evidence warranted a finding that Stone failed to exercise reasonable care for Corsetti's safety. Earlier in this opinion, we set forth paragraph 4.16.1 of Industrial Bulletin No. 12, which was in evidence. Rule 4.16.1.4 requires that a "life line and safety belt or life net, as appropriate, shall be provided for and used by workmen engaged in the following operations: . . . Employees exposed to the hazard of falling more than twenty-five (25) feet above land, or temporary or permanent floor." Stone argues that Corsetti was not exposed to a "hazard of falling" within the meaning of paragraph 4.16.1.4; that paragraph 4.6.1 of Industrial Bulletin No. 12, also set forth above, defines "falling hazard" as a hole or opening in floors, roofs, walls, elevated platforms, and similar surfaces into or through which a person may fall. Stone says that there was no evidence that Corsetti was exposed to such a hole or opening, and that therefore the jury would not have been warranted in finding Stone negligent on the basis of a violation of paragraph 4.16.1.4. We disagree.

Stone correctly argues that the interpretation of an administrative regulation is a question of law which must be decided by the court. See, e.g., *Woodcock* v. *Trailways of New England, Inc.,* 340 Mass. 36, 42-43 (1959); *Niles* v. *Boston Rent Control Adm'r,* 6 Mass. App. Ct. 135, 149 (1978). In that respect, an administrative regulation which has the force of law is no different than a statute.[9] 1A C. Sands, Sutherland Statu-

[9] The plaintiffs, relying on *doCanto* v. *Ametek, Inc.,* 367 Mass. 776 (1975), argue that the interpretation of the regulations is a question of fact to be decided by the jury. In *doCanto* v. *Ametek, Inc., supra* at 784, we stated: "[T]he judge did not err in refusing to instruct the jury concerning the written standards of the American Standard Safety Code for Laundry Machinery and Operations [footnote omitted]. The meaning of the safety code was a contested question of fact. Ametek asserted the code required merely a safety bar that would stop the ironer, and all parties agreed that the

tory Construction § 31.06 (4th ed. 1972). But nothing in the regulations limits a "falling hazard" or a "hazard of falling" to a situation in which there is a hole or opening in an operating surface. Paragraph 4.6.1 merely sets forth the precautions required to protect workers from one type of falling hazard. Moreover, that paragraph requires that all such holes or openings be "guarded by a barrier sufficient to prevent falls." Thus, Stone's interpretation of the regulations would require that safety belts be provided only where there is already sufficient fall protection. Such an interpretation is contrary to common sense.

The terms "falling hazard" and "hazard of falling" are not defined in the regulations. There is no reason to conclude that they have other than their common and ordinary meaning. Therefore, the jury could have found that by standing on a platform thirty-six to forty feet above the ground, which was supported only by side brackets, Corsetti was as much exposed to a hazard of falling as he would have been had the platform been suspended by cables. As we have stated, Stone's expert testified that in the latter situation a safety belt would be required. Also, from the testimony of the plaintiffs' expert that the use of a safety belt and line were feasible, practical, and dictated by good safety management, the jury could have found that the use of that equipment was appropriate, and, therefore, that Stone violated the regulation by not providing and requiring its use. We also observe that, totally apart from the regulation, the experts' testimony, together with the evidence of the circumstances of Corsetti's fall, was sufficient to warrant the finding of Stone's negligence.[10] The judge

---

safety mechanism stopped the machine. The plaintiffs contended that to comply with the code, the safety bar or other guard must be capable of stopping the machine within a reasonable time. This dispute presented a factual question for the jury." That case, however, involved safety standards that were apparently adopted by a trade organization, rather than administrative regulations having the force of law.

[10] Because we have concluded that without reliance on OSHA regulations the evidence was sufficient to warrant a finding of Stone's negligence, we do not consider the effect of those regulations in this case.

properly denied Stone's motion for judgment notwithstanding the verdict.[11]

2. *The judge's charge.* Stone argues that the judge erred in failing to give instructions to the jury relative to (a) the significance of evidence of the custom and practice in the industry, (b) Corsetti's duty to mitigate damages; and (c) the jury's right to draw inferences from Corsetti's failure to call his treating physician.

After the judge gave his initial instructions to the jury, Stone objected to the judge's failure to give Stone's requested instruction number 18, which is set forth in the margin,[12] dealing with evidence of the custom and practice in the industry. The judge properly could have given the requested instruction. However, he did not do so and, instead, he charged the jury as follows: "It is only proper for you to consider on the issue of negligence or lack thereof what the custom and practice was in the construction industry, if you find that on the evidence, inasmuch as that may bear on the ultimate question of whether or not Stone was or was not negligent, or whether that negligence, if there was negligence, was causally related to the result that occurred."

Stone did not object to that instruction, nor did it request additional or clarifying instructions. "A judge is under no obligation to charge the jury in the specific language requested

[11] We acknowledge the brief filed on behalf of amicus curiae, Scaffold Industry Association. Amicus curiae argues that the State regulations contained in Industrial Bulletin No. 12 are preempted by the Federal OSHA regulations. The issue was not raised below, nor is it argued by Stone on appeal. We decline to consider the issue on appeal. In any event, there was evidence, apart from the safety regulations, which would have warranted a finding that Stone was negligent.

[12] "If you find that prior to September 26, 1978, it was the custom and practice in the construction industry not to require masons to wear safety belts when on scaffolds and if you further find that The Stone Company complied with and conformed to that practice and custom, then I instruct you that Stone's conformance to said practice and custom in the construction industry prior to September 26, 1978, is some evidence that Stone was not negligent. *Breault* v. *Ford Motor Co.,* 364 Mass. 352 (1973); *Stuart* v. *Roy Bros. Inc.,* 358 Mass. 446 (1970); *Kushner* v. *Dravo Corp.,* 339 Mass. 273."

by a party." *Cooke* v. *Walter Kidde & Co.*, 8 Mass. App. Ct. 902, 904 (1979). See *Fialkow* v. *DeVoe Motors, Inc.*, 359 Mass. 569, 575 (1971).

Stone also requested an instruction relative to Corsetti's obligation to mitigate his damages by returning to work as soon as he was able. The requested instruction is set forth in the margin.[13] There was no error in the judge's refusal to give the specific instruction requested by Stone. The request erroneously focused on lost earnings as a measure of damages. The judge correctly instructed the jury that Corsetti was entitled to recover for lost earning capacity. Because of our conclusion that the exclusion of collateral source evidence was error necessitating a new trial on the issue of damages, we need not consider whether Stone was entitled to a fuller instruction on loss of earning capacity than the judge gave.

Finally, Stone objects to the judge's refusal to instruct the jury that they could draw an adverse inference from the plaintiffs' failure to call Corsetti's treating physician, Dr. Thrasher. The plaintiffs called two other physicians who had examined Corsetti and who testified as to his disabilities. Stone then called Dr. Thrasher, who gave testimony largely, though not entirely, favorable to the defendants. In his closing argument, counsel for Stone commented on the plaintiffs' failure to call Dr. Thrasher. In addition, Stone requested the following instruction: "You may draw any inferences which you find appropriate from the plaintiff's failure to call his treating physician, Dr. Thrasher, to the witness stand, in view of his physical availability to testify and his physician-patient relationship with the plaintiff. *Berry* v. *Stone*, 345 Mass. 752, 755-756 (1963); *Grady* v. *Collins Transportation Company, Inc.*, 341 Mass. 502, 504-505 (1960); *Horowitz* v. *Bokron*, 337 Mass. 739, 743-744 (1958)." Instead, the judge instructed the jury as follows: "The general rule in Massachusetts is that if a witness is

---

[13] "If you find that the plaintiff could have returned to work earlier than he in fact did, then I instruct you to find that his damages for lost earnings may only be found for that period of time where you find he could not have worked. *Brian* v. *B. Sopkin & Sons*, 314 Mass. 180 (1943); *Quaranto* v. *Silverman*, 345 Mass. 423 (1963)."

available for a party and the party doesn't call that witness, an inference may be drawn adversely to that party. If, on the other hand, a witness is equally available to both parties the general rule is that there is no adverse inference to draw against either party because he has been called. Furthermore, the witness has been on the stand and been examined by both parties. You may or may not make anything of that circumstance. I simply tell you what the rule is in the existing Massachusetts law."

When the circumstances of a case are such that a party would be expected to call a witness who is available to testify but the witness is not called, the jury may be permitted to infer that the witness's testimony would have been adverse to that party. *Commonwealth* v. *Franklin,* 366 Mass. 284, 292-293 (1974); *Berry* v. *Stone, supra* at 756; *Grady* v. *Collins Transp. Co., supra* at 509. In this case, however, because Dr. Thrasher did testify, the principle enunciated in those cases does not apply. There was no error.

3. *Evidence of collateral source income.* The trial took place in June, 1983. Stone attempted to introduce evidence that since 1981 Corsetti had been receiving income from various sources, including social security and worker's compensation benefits, in excess of his pre-accident income. On two occasions during the trial, the judge conducted a voir dire in which the plaintiffs testified that Corsetti had received benefits in excess of $15,000 a year since 1981. Corsetti had an income of approximately $9,000 and $10,000 in the two years prior to his accident. Although the judge agreed that the evidence was "imminently relevant," he ruled that it was too confusing to be presented to the jury. He suggested that the parties stipulate to the amount of Corsetti's income from collateral sources for transmission to the jury with appropriate limiting instructions. The plaintiffs, however, refused to stipulate to the amounts received, and the judge refused to allow the information to be presented to the jury.

Ordinarily, "a defendant may not show that the plaintiff has received other compensation for his injury, whether from an accident insurance policy, . . . from workmen's compensa-

tion, . . . from an employer, . . . or from other sources (cita-tions omitted)." *Goldstein* v. *Gontarz,* 364 Mass. 800, 808-809 (1974). The rationale behind this so-called "collateral-source rule" is that the receipt of such income does not lawfully reduce the plaintiffs' damages, "yet jurors might be led by the irrele-vancy to consider plaintiffs' claims unimportant or trivial or to refuse plaintiffs' verdicts or reduce them, believing that otherwise there would be unjust double recovery." *Id.* at 809. However, there is an exception to that rule. Our cases have long recognized that in some circumstances, evidence of col-lateral source income may be admissible, in the discretion of the trial judge, "as probative of a relevant proposition, say 'control' *or credibility of a particular witness*" (emphasis added). *Id.* at 812. Thus, in *McElwain* v. *Capotosto,* 332 Mass. 1, 2-3 (1954), we held that it was within the trial judge's discretion to admit evidence that the plaintiff was being paid while he was out of work because, even though the sums paid to the plaintiff would not properly reduce the recoverable dam-ages for actual loss of earning capacity due to the accident, the evidence nevertheless was relevant to the plaintiff's motive for staying out of work. Relying on that decision, in *Centola* v. *Driscoll,* 4 Mass. App. Ct. 817 (1976), the Appeals Court affirmed the admission of evidence of collateral source income where there was other evidence that suggested that the plaintiff was malingering,[14] and where the trial judge instructed the jury that the evidence was limited to the question whether the plain-tiff's absence from work had been prolonged by reason of his receipt of insurance payments. See also *Nassif* v. *Smith,* 4 Mass. App. Ct. 814 (1976) ("Whether [the collateral source income]

---

[14] Where there is no other evidence to suggest that a plaintiff's prolonged absence from work is a result of anything other than his disability, the fact that he was receiving collateral source income has little, if any, probative value. Where, however, other evidence of malingering makes the plaintiff's motive for staying out of work a genuine issue at trial, evidence of collateral source income may be persuasive confirmation of malingering.

Justice Abrams incorrectly asserts (at 31-32) that the existence of evidence of malingering other than evidence of collateral source income argues in favor of excluding the evidence of collateral source income. The opposite is true.

evidence was admissible for the limited purpose of affecting the weight of the plaintiff's testimony that he was unable to work on account of the accident was within the discretion of the judge (*McElwain* v. *Capotosto, supra* at 3) as an exception to the 'collateral-source' rule").

Whether Corsetti continued to be totally disabled was a vigorously contested issue at trial. Corsetti testified that he had not worked since the accident and that because of his injuries he was unable to hold any kind of job. This testimony was corroborated by two medical doctors and a vocational counselor who testified on his behalf. However, Dr. Thrasher, Corsetti's treating physician at the time of the accident, testified that when he last saw Corsetti in November, 1981, the physical findings did not support Corsetti's most recent complaints, and that he felt that those complaints might be related to Corsetti's desire to make a better case. Corsetti testified that his injuries had substantially improved by the time of the trial. Thus, evidence that Corsetti's income after the accident was higher than his income while he was working would have given substantial support to Stone's contention that he had a motive other than physical disability to remain out of work.

Nevertheless, our holding that Stone was entitled as a matter of right to the admission of that evidence is not, as Justice Liacos says it is, grounded on its relevance to the issue of malingering. See *Pemberton* v. *Boas,* 13 Mass. App. Ct. 1015, 1018 (1982). The proffered evidence did not bear solely on the question of malingering. It also directly contradicted Corsetti's testimony, elicited by Corsetti's counsel on direct examination, that, as a result of Corsetti's injuries, his wife was required to work full time up to the time of trial (inferentially because of Corsetti's lack of resources as a result of his injuries), thus aggravating him,[15] and that he and his wife fought about money (again, inferentially, because Corsetti had

---

[15] Nothing in the record either requires or justifies the inference, expressed by Justice Abrams (at 32), that Corsetti's wife increased her work schedule from half time to full time "not . . . because of financial need, but rather in order that she might get out of the house to escape her husband's irritability."

less money .after the accident than he had before it), and it contradicted Margherita Corsetti's testimony that Corsetti and she had a bleak Christmas, partially because of lack of money.[16] In addition, on cross-examination, defense counsel asked Corsetti whether he ever went to the movies. That question was entirely appropriate in light of Corsetti's earlier testimony on direct examination that his practice was to stay in the house all day and that he was unable to watch television very much

---

[16] The following are excerpts from Corsetti's testimony in response to his counsel's questions during the presentation of the plaintiffs' case:

PLAINTIFFS' COUNSEL: "Before you got hurt was it your regular practice to turn your paycheck over to her? Then she would dole out the money? Run the household?"

CORSETTI: "Yes. I give to her for the whole house."

PLAINTIFFS' COUNSEL: "Has she done any more work now? Has she begun working more frequently since you have been out?"

CORSETTI: "Before she went to work parttime. Now she works full-time."

PLAINTIFFS' COUNSEL: "Has she ever worked full-time, outside of the house? Since your being in the house all the time, has this affected your relationship at all?"

CORSETTI: "Yes."

PLAINTIFFS' COUNSEL: "How?"

CORSETTI: "Well, sometimes we fight, we do a lot of argument. Everything."

PLAINTIFFS' COUNSEL: "Do you end up fighting about money?"

CORSETTI: "Yeah."

. . .

PLAINTIFFS' COUNSEL: "Has it affected you at all that you have been working since you were 16 and are no longer working?"

CORSETTI: "Yes."

PLAINTIFFS' COUNSEL: "Does it bother you now?"

CORSETTI: "Yes. It drives me crazy."

PLAINTIFFS' COUNSEL: "Why?"

CORSETTI: "Because I used to go to work. I used to love to go to work."

PLAINTIFFS' COUNSEL: "Why?"

CORSETTI: "Because I like to, you know, earn money, support the family. Now because my wife is working I get aggravated."

PLAINTIFFS' COUNSEL: "Does she give you any money for lunch, or anything like that?"

CORSETTI: "Yes. Sometimes."

Margherita Corsetti testified to the following on direct examination:

PLAINTIFFS' COUNSEL: "How was Christmas in 1978?"

MARGHERITA CORSETTI: "How was it? Sort of bleak, not to — financially and otherwise."

because sounds bothered him.[17] Although the question called for a "yes" or "no" answer, Corsetti volunteered that he did not go to the movies because he could not afford to do so,[18] again focusing on his lack of money as a result of his injuries.

As Justice Abrams says in her dissenting opinion, citing numerous cases as examples (31 n.2), several courts have held that evidence of collateral source income is admissible "where a plaintiff in a personal injury action has volunteered testimony as to penurious circumstances allegedly resulting from his injury." That is precisely the case here. Contrary to Justice Abrams's assertion (at 34), Stone did not solicit any statement from Corsetti regarding his financial straits. The plaintiff volunteered those statements on both direct and cross-examination. As Justice Abrams recognizes (at 35), a plaintiff who affirmatively pleads poverty, "should be forced to confront the consequences of that choice on cross-examination."

The exclusion of evidence contradicting Corsetti's testimony clearly was prejudicial to Stone. Elementary principles of fairness required that Stone be permitted to challenge the seriously damaging testimony volunteered by Corsetti by demonstrating that after Corsetti's accident he had more money than he had before it. Elementary fairness also required that Corsetti not be shielded from a cross-examination that strongly tended to impeach all of Corsetti's testimony by exposing the falsehood of some of it.

---

[17] PLAINTIFFS' COUNSEL: "What do you do with yourself all day?"
CORSETTI: "Stay in the house."
PLAINTIFFS' COUNSEL: "Doing what?"
CORSETTI: "Nothing."
PLAINTIFFS' COUNSEL: "Watch TV?"
CORSETTI: "I can't watch TV too much."
PLAINTIFFS' COUNSEL: "Why not?"
CORSETTI: "Bothers me."
PLAINTIFFS' COUNSEL: "Why does it bother you?"
CORSETTI: "Because every little noise bothers me. Sounds, noises bother me."

[18] DEFENSE COUNSEL: "Have you ever been to the movies?"
CORSETTI: "No."
DEFENSE COUNSEL: "Never been to the movies?"
CORSETTI: "No. I can't afford to go to the movies."

In the absence of a stipulation of the relevant information, which would have been the preferable course, see *Goldstein* v. *Gontarz,* at 814, the evidence in question should have been admitted and appropriate limiting instructions should have been given. A new trial on the question of the plaintiffs' damages is necessary.

4. *Deal's motion for judgment notwithstanding the verdict.* The plaintiffs and Stone argue that the decision of the trial judge granting Deal's motion for judgment notwithstanding the verdict was erroneous. When reviewing a decision granting a defendant's motion for judgment notwithstanding the verdict, we consider whether, when viewed most favorably to the plaintiff, "the evidence is such that, without weighing the credibility of the witnesses or otherwise considering the weight of the evidence, there can be but one conclusion as to the verdict that reasonable men could have reached" (citations omitted). *O'Shaughnessy* v. *Besse,* 7 Mass. App. Ct. 727, 728 (1979), quoting *Simblest* v. *Maynard,* 427 F.2d 1, 4 (2d Cir. 1970). We set forth the evidence relevant to the defendant Deal.

In 1950, A. Gene Febbo began manufacturing scaffolding through a company known as Deal Products (Deal I). In 1968, Febbo sold the business to Aydin Corporation, which continued to manufacture scaffolding through its Deal Products Division (Deal II). On December 23, 1971, Aydin agreed to sell all of the assets of its Deal Products Division to Edward Cantor. Cantor in turn assigned the agreement of sale to the then newly formed defendant, Deal Products, Inc. (Deal). The design and manufacturing process for Deal side brackets remained essentially the same under each company.

The R.A. Salvucci Construction Company owned the scaffolding that was used by the masons on the Computervision project. Salvucci owned several types of scaffolding, including side-brackets made by Deal. Salvucci had acquired some of this scaffolding from another company that had purchased it second-hand in 1971 or 1972 from a company in Maine. Salvucci had also purchased some scaffolding directly from Deal between 1977 and 1979.

Immediately after Corsetti's accident, John Calnan, Computervision's project manager, saw a side bracket at the scene of the accident. He could not identify the manufacturer of the bracket, but he stated that the bracket looked "abused." Thomas Burke, the superintendent, also observed a broken side bracket at the scene. Burke testified that the hook that attached the bracket to the main frame of the scaffolding was separated from the triangular portion of the bracket about one-half inch from the weld that joined the two pieces. Burke could not identify the manufacturer of the bracket. He put both pieces of the broken side bracket into his trailer. Bill Powers, Salvucci's foreman, testified that he took both pieces of a broken side bracket from the trailer and brought it to Salvucci's office. He stated that the bracket was broken at the weld between the hook and the triangular portion of the bracket. He identified this bracket as a Deal bracket. Salvucci testified that he was shown part of a side bracket that was broken at the weld. He also identified this bracket as a Deal bracket. The broken side bracket was apparently lost within days of the accident and was not put in evidence. There was no evidence to establish when the broken side bracket was manufactured.

An expert witness for the plaintiffs testified that Deal brackets were not adequately tested or inspected, and that the brackets should have been date-stamped and should have carried warnings or instructions for periodic testing to discover fatigue cracks in the weld area. He also testified that the circumstances surrounding Corsetti's accident were "consistent with a gradual fatigue failure of the weld area." Stone's expert testified that Deal side brackets were not properly designed. He stated that the design created unacceptable stress at two critical points on the bracket which would inevitably lead to fatigue failure. He testified that the brackets were not adequately tested or inspected and that users of the bracket should have been instructed to periodically test it.

The judge granted Deal's motion for judgment notwithstanding the verdict on the grounds that there was no evidence to support a finding that the side bracket which caused Corsetti's injuries was manufactured and sold by Deal rather than

by its predecessors and that Deal could not be held liable for the negligent acts or omissions of a predecessor corporation. On appeal, Stone and the plaintiffs argue that the judge erred in granting Deal's motion for judgment notwithstanding the verdict because the case falls within three exceptions to the general rule against successor corporate liability. First, they argue that Deal contractually assumed the liabilities of its predecessor, Aydin Corp. Second, they argue that the case falls within the continuity of enterprise exception to the rule against successor liability. See *Cyr* v. *B. Offen & Co.,* 501 F.2d 1145 (1st Cir. 1974). Third, they argue that Deal should be held liable for the torts of its predecessor under the "product line" theory. See *Ray* v. *Alad Corp.,* 19 Cal. 3d 22 (1977). The plaintiffs also argue that there was evidence from which the jury could have found that Deal breached a duty to warn users of design weaknesses in the side bracket and that, on that basis, Deal could have been found liable for its own negligence.

Deal argues that the judge correctly held that the exceptions to the rule against successor corporate liability do not apply to this case. In addition, Deal argues that the judge properly granted judgment notwithstanding the verdict because (a) the court lacked personal jurisdiction over Deal; (b) there was insufficient evidence to support a finding that the bracket that caused Corsetti's accident was a Deal bracket; (c) there was insufficient evidence that the negligence of Deal or its predecessors caused the accident; and (d) Deal had no duty to warn remote purchasers of defects in its products. We conclude that the judge properly granted Deal's motion for judgment notwithstanding the verdict. We base our holding on the insufficiency of the evidence to support a finding that the negligence of either Deal or its predecessors caused Corsetti's accident. Therefore, we need not confront the parties' other arguments.

In an action based on negligence, the plaintiffs "[have] the burden of proving that a defect attributable to the manufacturer's negligence caused the injury." *Carney* v. *Bereault,* 348 Mass. 502, 506 (1965). The plaintiffs must show "that there was greater likelihood or probability that the harm complained of was due to causes for which the defendant was responsible

than from any other cause." *Mullins* v. *Pine Manor College,* 389 Mass. 47, 58 (1983), quoting *Carey* v. *General Motors Corp.,* 377 Mass. 736, 740 (1979). "Where, as here, the accident occurs after the defendant has surrendered control of the instrumentality involved, it is incumbent upon the plaintiff to show that the instrumentality had not been improperly handled by himself or by intermediate handlers." *Coyne* v. *John S. Tilley Co.,* 368 Mass. 230, 237 (1975), quoting *Evangelio* v. *Metropolitan Bottling Co.,* 339 Mass. 177, 183 (1959). If "on all the evidence, it is just as reasonable to suppose that the cause is one for which no liability would attach to the defendant as one for which the defendant is liable," then judgment must be entered for the defendant. *O'Shaughnessy* v. *Besse, supra* at 729, quoting *Bigwood* v. *Boston & No. St. Ry.,* 209 Mass. 345, 348 (1911).

From the evidence presented at trial the jury reasonably could have found that Deal or one of its predecessors was negligent in designing and manufacturing a side bracket that would inevitably fail due to fatigue in the weld area. Even if the negligence of a predecessor were to be attributed to Deal, however, there was no evidence from which the jury reasonably could have inferred that the negligence of Deal or its predecessor was the cause of Corsetti's injuries. There was no evidence that the break in the side bracket probably resulted from fatigue failure, or that a warning concerning the bracket's proneness to fatigue failure and the wisdom of testing for it would have prevented Corsetti's accident.

The only evidence as to the condition of the side bracket at the time it broke was that the bracket looked "abused." There was also evidence that it was Salvucci's practice to send broken pieces of scaffolding to be repaired, which sometimes involved rewelding hooks onto the triangular pieces of side brackets. There was no contrary evidence from which the jury could properly have inferred that the particular side bracket at issue was in the same condition at the time of the accident as when it was sold by Deal or its predecessors. Compare *Coyne* v. *John S. Tilley Co., supra* at 237-238 (evidence that broken ladder appeared bright, new, and defect free prior to accident

sufficient to warrant inference that it was not mishandled by intermediaries).

Neither of the expert witnesses who testified on behalf of the plaintiffs and Stone had examined the side bracket involved in the accident. Stone's expert expressed no opinion as to the cause of the accident. The plaintiffs' expert testified that the circumstances surrounding the accident were "consistent with" a break resulting from fatigue failure. That testimony warranted a finding that it was possible that fatigue failure at the weld was the cause of the plaintiff's accident, but it was not sufficient to support a finding of probability in that regard. See *Shrewsbury Retirement Bd.* v. *Contributory Retirement Appeal Bd.*, 5 Mass. App. Ct. 379, 381 (1977). On the evidence, it was no less likely that the break in the side bracket was caused by intermediate mishandling or faulty repairs. Therefore, the jury were not warranted in finding that Corsetti's injury probably resulted from defective design, manufacture, or warning.

5. *The plaintiffs' motion for sanctions against Stone.* On June 29, 1979, in the course of pretrial discovery, the plaintiffs filed a request for production of documents under Mass. R. Civ. P. 34. Among other things, the plaintiffs requested copies of Stone's primary and excess insurance agreements. On July 11, 1979, Stone, by its attorney,[19] responded that it had general liability insurance with a policy limit of $500,000. On April 7, 1983, during a deposition of Stone's president, the plaintiffs learned that Stone also had additional coverage under an excess liability policy with a limit of $1,000,000.

On April 15, 1983, the plaintiffs filed a motion pursuant to Mass. R. Civ. P. 37 (b), (c), & (d), seeking sanctions in the form of a $10,000 fine for Stone's failure to respond to its request for production. On April 19, 1983, Stone filed a supplemental response to the plaintiffs' request for production of documents, indicating that it had excess liability coverage of $1,000,000. Also on April 19, a judge of the Superior Court held a hearing on the plaintiffs' motion for sanctions. The

---

[19] We note that Stone's counsel at trial and on appeal was not the same as Stone's counsel during the relevant discovery period.

judge then denied the motion, endorsing it as follows: "After hearing, the Court concludes that the matter is moot (the information having already been supplied to plaintiff); it thus appears that the Court lacks discretionary power to proceed further. If I believed myself to possess the authority to do so, I would consider the matter and would entertain affidavits and oral testimony under oath. If the failure to disclose was wilful, a heavy sanction would be an appropriate means of ensuring the integrity of [Mass. R. Civ. P.] 26 (b) (2). *Motion Denied.*" The plaintiffs appeal from the denial of the motion.

Massachusetts Rule of Civil Procedure 37 (d), 365 Mass. 800 (1974), provides in part: "If a party . . . wilfully fails . . . (3) to serve a written response to a request for inspection submitted under Rule 34, after proper service of the request, the court in which the action is pending on motion may make such orders in regard to the failure as are just, and among others it may take any action authorized under paragraphs (A), (B), and (C) of subdivision (b) (2) of this rule." The rule affords a judge broad discretion to impose whatever sanctions are just in order to ensure that the discovery process operates efficiently. The motion judge apparently reasoned, however, that because the information sought had already been provided to the plaintiffs, the matter was moot and he had no discretion to impose sanctions under the rule. We do not agree.

The sanctions provided by rule 37 are designed not only to compel compliance with discovery requests; they also act as a deterrent to unwarranted evasions of discovery. A party will almost always, in the absence of a complete failure to respond, be unable to seek sanctions for a failure to comply with discovery requests unless and until the party learns that the response it received was incorrect or incomplete. If possession of that information were to render the matter moot, then rule 37 would be an ineffective tool for deterring wilful violations of the discovery rules. See C.A. Wright & A.R. Miller, Federal Practice and Procedure § 2291 (1981) (interpreting Fed. R. Civ. P. 37[d]) ("the rule does not become inapplicable because a response is made in the interim between the filing of the motion for sanctions and the hearing on the motion").

Here, however, the only sanction sought by the plaintiffs, was a fine in the amount of $10,000 to be paid to the court. It is not at all clear that a fine may be assessed under rule 37 (d) or under the analogous Federal rule. The parties have not addressed this issue in their briefs. We therefore decline to consider the issue. See Mass. R. A. P. 16 (a) (4), as amended, 367 Mass. 919 (1975). The plaintiffs having failed to meet their burden of demonstrating error, we affirm the denial of the motion for sanctions.

6. *Conclusion.* The judgment for Deal Products, Inc., is affirmed. The order denying the plaintiffs' motion for sanctions is also affirmed. The judgment against The Stone Company is reversed, and the case is remanded to the Superior Court for a new trial confined to the issue of damages.

*So ordered.*


LIACOS, J. (dissenting). I agree with the court's treatment of all but one of the various issues raised by these cross appeals. I do not agree, however, that a new trial on damages is required. Therefore, I dissent from the court's order in this case and from that part of the court's opinion which holds that the trial judge erred in excluding evidence of Corsetti's collateral source income.

As the court itself makes clear, this State has a "collateral-source rule" of long standing. Under that rule, evidence of a plaintiff's income from collateral sources — accident or disability insurance, or workers' compensation benefits, for example — may not be admitted at trial because such evidence is "prejudicial or irrelevant." *Chaves* v. *Weeks,* 242 Mass. 156, 158 (1922); See *Shea* v. *Rettie,* 287 Mass. 454, 457-458 (1934); *Gray* v. *Boston Elevated Ry.,* 215 Mass. 143, 146 (1913). Cf. *Goldstein* v. *Gontarz,* 364 Mass. 800, 808-809 (1974).

The court effectively holds today that there is an exception to the collateral-source rule whenever evidence of collateral source income is offered as evidence that the plaintiff is a malingerer. Although the court speaks of impeaching the credi-

bility of the plaintiff, it seems clear that the gist of the court's holding is that the evidence of collateral income may be offered to show a claimant to be a malingerer. In reaching this result, the court substitutes, without justification, its discretion for that of an experienced trial judge. It also creates an open-ended exception to the collateral-source rule. Under this newly stated exception, evidence of collateral source income would be admitted to show that the plaintiff has a reason other than his or her disability for staying out of work, i.e., an adequate income from collateral sources.

The court finds justification for its position in *McElwain* v. *Capotosto,* 332 Mass. 1 (1954). In *McElwain,* this court merely held that "it was within the discretion of the judge to admit [evidence of collateral source income] on cross-examination to affect the weight of the plaintiff's previous testimony that he was disabled from working on account of the accident." *Id.* at 3. *McElwain,* contrary to the court's position today, evinced considerable deference for the discretion of the trial judge. "It is elementary that the extent of cross-examination is generally within the control of the trial judge." *Id.*

The Appeals Court, in two rescript opinions, has upheld the discretion of a trial judge to allow questioning of the plaintiff on cross-examination on the issue of collateral source payments. *Centola* v. *Driscoll,* 4 Mass. App. Ct. 817 (1976); *Nassif* v. *Smith,* 4 Mass. App. Ct. 814 (1976). *Nassif* is inapposite to the present case, however, because the *plaintiff* initially introduced evidence of his receipt of collateral source payments and subsequently objected to the introduction of a stipulation of the amount of the collateral source income. I note that *Centola* v. *Driscoll, supra,* cites only *McElwain* v. *Capotosto, supra,* as authority.

I do not believe that *McElwain* v. *Capotosto* and *Centola* v. *Driscoll* clearly establish the existence of a malingerer exception as matter of law. Moreover, I would be wary of establishing such an exception. I would adopt the view that evidence of collateral source income may not be admitted to show that the plaintiff is a malingerer. Even assuming such evidence to be relevant, the inherent risks of undue prejudice should require

exclusion of such evidence.[1] I would adhere to the view of the Supreme Court of the United States when it stated: "In our view the likelihood of misuse by the jury clearly outweighs the value of this evidence. Insofar as the evidence bears on the issue of malingering, there will generally be other evidence having more probative value and involving less likelihood of prejudice than the receipt of a disability pension. . . . [P]etitioner's receipt of collateral social insurance benefits involves a substantial likelihood of prejudicial impact." *Eichel* v. *New York Cent. R.R.,* 375 U.S. 253, 255 (1963). That there generally will be other, better, and less prejudicial evidence of malingering than evidence of the receipt of collateral source income is demonstrated by the present case. The plaintiff's own doctor was called to the stand by the defendants, and he testified that his findings as to the plaintiff's physical condition did not bear out the plaintiff's complaints.

Some hostility to the collateral-source rule has been engendered by the notion that with the exclusion of evidence of collateral source income plaintiffs could receive a double recovery. This ground of objection no longer has much basis. See generally Esdaile, The Collateral Source Rule, 68 Mass. L. Rev. 102, 103-104 (1983) (discussing statutory elimination of double recovery). Thus, given that evidence of collateral source income has a "substantial likelihood of prejudicial impact," *Eichel* v. *New York Cent. R.R., supra,* and that the fear that the exclusion of such evidence will result in double recovery has been largely eliminated, I see no reason to recognize such an exception to the collateral-source rule.

I also do not agree with the court's conclusion that the judge erred in excluding the evidence of collateral source income. To my knowledge, this is the first case in which this court has held that a party is "entitled as a matter of right" to the admission of evidence of collateral source payments. I would not so hold, particularly as each of the cases which purportedly establishes

---

[1] This is particularly so where, as here, the trial judge has made such a determination of undue prejudice.

this malingerer exception is grounded in respect for the judge's discretion. See *Pemberton* v. *Boas,* 13 Mass. App. Ct. 1015, 1018 (1982) ("Both [*McElwain* v. *Capotosto* and *Nassif* v. *Smith*] recognize . . . that the admissibility of [evidence of collateral source income] for that purpose [to show malingering] is within the discretion of the judge, and we cannot say the judge abused his discretion in excluding it here").

Last, even if we assume that the defendant was entitled to the admission of evidence of collateral source income, the court's opinion is remarkably conclusory on whether the assumed error prejudiced the defendant. As Justice Abrams correctly points out in her separate opinion, there was other evidence of malingering without the evidence of collateral benefits. There is no basis for the court's conclusion that a new trial is necessary. I would have thought that, at the very least, the court would adhere to the fundamental notion that a trial error does not require a new trial, absent a showing of prejudice to the party aggrieved. G. L. c. 231, § 119 (1984 ed.) ("No error in either the admission or the exclusion of evidence . . . is ground for modifying or otherwise disturbing a judgment . . . unless . . . the supreme judicial court deems that the error complained of has injuriously affected the substantial rights of the parties"). See *Moran* v. *School Comm. of Littleton,* 317 Mass. 591, 597 (1945), *Larson* v. *Jeffrey-Nichols Motor Co.,* 279 Mass. 362, 368 (1932), and *Posell* v. *Herscovitz,* 237 Mass. 513, 516-517 (1921). I would affirm the judgments.


ABRAMS, J. (dissenting). I dissent from that portion of the court's opinion which concludes that the exclusion of collateral source evidence was error necessitating a new trial on the issue of damages. I find it incredible that the court is substituting its judgment for that of a highly experienced trial judge with respect to a discretionary matter concerning the exclusion of evidence. We have not done so in the past. See *Rocco* v. *Boston-Leader, Inc.,* 340 Mass. 195, 197 (1960); *Griffin* v. *General Motors Corp.,* 380 Mass. 362, 365-366 (1980). Moreover, it is highly irregular for an appellate court to disturb

the proper exercise of the judge's discretion on a theory not offered to the judge and on a record which does not clearly disclose error.

Collateral source evidence has been deemed irrelevant because "the receipts from the outside source do not go to reduce the defendant's liability; yet jurors might be led by the irrelevancy to consider plaintiffs' claims unimportant or trivial or to refuse plaintiffs' verdicts or reduce them, believing that otherwise there would be unjust double recovery." *Goldstein* v. *Gontarz,* 364 Mass. 800, 809 (1974). Exceptions to any general rule should be cautiously considered, lest the exceptions swallow the rule. That is what the court's opinion today may do with respect to the collateral-source rule.

The defendants sought to pierce the collateral-source rule not for the limited purpose of impeaching the plaintiffs' credibility. They specifically wished to influence the jury's opinion as to damages.[1] The judge exercised his discretion against the admission of the evidence, reasonably fearing that such evidence "becomes too confusing." We ought to respect that assessment.

In the appropriate circumstances, I too would endorse a narrowly-tailored exception to the collateral-source rule,[2] but

---

[1] As one defense counsel argued below: "What more cogent evidence would this jury like to hear, that the fellow is doing a hell — he's doing a great deal better now by staying out of work than he was doing when he was working, because he's got Social Security . . . ."

[2] Several courts have recognized only a highly circumscribed exception to the collateral-source rule in permitting the introduction of collateral source benefits evidence where a plaintiff in a personal injury action has volunteered testimony as to penurious circumstances allegedly resulting from his injuries. See, e.g., *Gladden* v. *P. Henderson & Co.,* 385 F.2d 480 (3d Cir. 1967), cert. denied, 390 U.S. 1013 (1968) (plaintiff testified he returned to work because he had fallen behind in the payment of his bills); *Lange* v. *Missouri Pac. R.R.,* 703 F.2d 322 (8th Cir. 1983) (plaintiff asserted he had to return to work immediately after surgery because he had no disability income); *York* v. *Young,* 271 Ark. 266 (1980) (plaintiff testified he could not afford to have his truck repaired); *Jackson* v. *Beard,* 146 Ind. App. 382 (1970) (plaintiff's attorney questioned plaintiff as to lessened income after automobile collision); *Jojola* v. *Baldridge Lumber Co.,* 96 N.M. 761 (Ct. App. 1981) (plaintiff testified he had no money, food, or lights); *Hack*

the circumstances of this action do not cry out for the creation of such an exception. First, there was ample evidence here of malingering, without collateral source benefits evidence.[3] The defendants, thus, could hardly maintain that, were the judge to enforce the collateral-source rule, they would be left without a basis on which to challenge the plaintiffs' credibility.

Second, nothing in the plaintiffs' case opened the door to the defendants' introduction of collateral source benefits evidence. Although the plaintiff here testified on direct examination that his wife increased her work schedule from part time to full time after his accident, the context of that testimony suggests not that Mrs. Corsetti did so because of financial need, but rather in order that she might get out of the house to escape her husband's irritability. Further, while the plaintiff testified on direct that he and his wife fought about money, that he liked to "earn money, support the family," and was "aggravated" because his wife worked, that testimony alone, in my view, would be unlikely to mislead a jury into believing that the plaintiff was poverty-stricken or unable to meet household expenses as a result of his injuries.

---

v. *State Farm Mut. Auto. Ins. Co.,* 37 Wis. 2d 1, 10 (1967) (plaintiff testified he went back to work because he needed money to support family). See generally Annot., 47 A.L.R.3d 234, 250 (1973 & Supp. 1984). The rationale in these cases is that "[t]he [plaintiff] having opened the gate on the matter of reduced income as a result of the [injury] complained of, the [defendant] has the right to drive through and to cross examine on the issues, raised by [plaintiff]." *Jackson* v. *Beard, supra* at 398. Collateral source benefits "become relevant when the plaintiff's direct testimony misleads the jury on some issue in the case and cross-examination of the plaintiff on evidence of collateral source payments is necessary to rebut the testimony." *Lange* v. *Missouri Pac. R.R., supra* at 324. To forbid "cross-examination would [confer] on plaintiff the unparalleled right to give testimony on direct examination with immunity from inquiry on cross-examination." *Gladden* v. *P. Henderson & Co., supra* at 483.

[3] As the court indicates, "Dr. Thrasher, Corsetti's treating physician at the time of the accident, testified that when he last saw Corsetti in November, 1981, the physical findings did not support Corsetti's most recent complaints, and that he felt that those complaints might be related to Corsetti's desire to make a better case. Corsetti testified that his injuries had substantially improved by the time of the trial." *Ante* at 18.

The excerpts selected by the court from the plaintiff's testimony are susceptible to more than one interpretation. The court stresses that Corsetti averred that his wife worked full time after his accident and that the couple fought about money. But that testimony must be understood in light of the general line of questioning in which it arose. The point in the exchange, set forth in the margin,[4] seems to me to be that the plaintiffs fought not because they were suddenly poor, but because Corsetti, disabled and inactive, was no longer participating in the household shopping and was now bickering with his wife over her expenditures.

The court next finds fault with Mrs. Corsetti's characterization of the Christmas of 1978 as "bleak." But recall that Corsetti's injuries occurred on September 26, 1978, only three months before Christmas. I see no indication in the record that Corsetti received expedited funds, either workmen's compensation or Social Security disability benefits. Very likely, the Corsettis' Christmas that year was bleak — "financially and otherwise."

Last, the court lays emphasis on Corsetti's statement that he used "to love to go to work" because he liked to "earn

---

[4] PLAINTIFFS' COUNSEL: "Do you ever go to the store shopping with your wife, or do any shopping for your wife?"
CORSETTI: "I go with my wife sometimes."
PLAINTIFFS' COUNSEL: "How do you help her when you go to the store now?"
CORSETTI: "Just walk beside her."

. . .

PLAINTIFFS' COUNSEL: "She does all the shopping for the house?"
CORSETTI: "Right."
PLAINTIFFS' COUNSEL: "She has to check out the prices and stuff like that, right?"
CORSETTI: "Right."
PLAINTIFFS' COUNSEL: "Did you ever go shopping with your wife before and help her check the stuff?"
CORSETTI: "Yeah. I used to before."
PLAINTIFFS' COUNSEL: "Who does the clothing shopping now?"
CORSETTI: "My wife."
PLAINTIFFS' COUNSEL: "Do you end up fighting about money?"
CORSETTI: "Yeah."

money, support the family." He added, "Now because my wife is working I get aggravated." But again, this testimony, read in context, is innocuous.[5] Here, it seems to me, the plaintiffs' counsel was focusing on Corsetti's loss of self-esteem, rather than merely loss of income. Corsetti's comments convey not that he was *wanting* for money, but only that he was not *earning* any. Moreover, he was frustrated not because his wife was *compelled* to work, but that she was the only one *able* to work.

It is clear, in any event, that the judge did not perceive any of these statements by the plaintiffs as deceptive. When considering whether to permit the defendants to introduce collateral source benefits evidence, the only basis he saw was "that it would go to the credibility of the *claim* that [the plaintiff] cannot work" (emphasis added).

Had the plaintiff offered a blatantly distorted version of his circumstances, we would be justified in tampering with a time-honored financial prescript. I am hard put to read such a distortion into the facts before us. It was only on cross-examination by counsel for the defendant The Stone Company that the plaintiff's assertions could be seen as misleading. When asked by defense

---

[5] PLAINTIFFS' COUNSEL: "How has this incident, injury you have suffered from changed your own opinion about yourself?"

CORSETTI: "A lot. I don't feel like the same, like I used to feel before."

PLAINTIFFS' COUNSEL: "Why not?"

CORSETTI: "I feel a different person."

PLAINTIFFS' COUNSEL: "Has it affected you at all that you have been working since you were 16 and are no longer working?"

CORSETTI: "Yes."

PLAINTIFFS' COUNSEL: "Does it bother you now?"

CORSETTI: "Yes. Drives me crazy."

PLAINTIFFS' COUNSEL: "Why?"

CORSETTI: "Because I used to go to work. I used to love to go to work."

PLAINTIFFS' COUNSEL: "Why?"

CORSETTI: "Because I like to, you know, earn money, support the family. Now because my wife is working I get aggravated."

. . .

PLAINTIFFS' COUNSEL: "How do you feel about yourself since this accident? You are unable to work and your position?"

CORSETTI: "I can't feel — I can't work any more. I don't feel like I can work any more."

counsel whether he had attended a movie since his accident, Corsetti replied, "No. I can't afford to go to movies."[6] This was clearly not an instance in which the plaintiff made it part of his case-in-chief to show financial need. To permit the defendants to bootstrap an exception to the collateral-source rule onto their own solicitation of statements from Corsetti regarding his financial straits would pervert the rationale for an exception to the rule. That rationale is simply that the collateral-source rule inures to the benefit of the plaintiff; but should the plaintiff attempt to take advantage of that rule by affirmatively pleading poverty, he should be forced to confront the consequences of that choice on cross-examination.

Nor, finally, did Corsetti attempt to take advantage of the rule by inflating his earning capacity to include amounts referable to collateral source benefits. The plaintiffs' expert based his projections on Corsetti's income for 1978, a figure of some $9,000.

In any event, if it were doubtful in the first instance whether the plaintiffs' case affirmatively introduced a misleading economic element, resolution of that question was best committed to the discretion of the trial judge. See *Pemberton* v. *Boas,* 13 Mass. App. Ct. 1015, 1018 (1982). In view of the availability of ample evidence as to the plaintiff's malingering, see note 3, *supra,* the defendants have no valid claim that the judge's ruling was prejudicial to their case.

Perhaps most significant is the fact that the court has not formulated its exception to the collateral-source rule with the degree of limpidity sufficient to afford guidance to the trial

---

[6] Once again, the court strains to see this response as misleading, and here, too, I disagree. The plaintiff was not claiming that because of his instant financial status he was *no longer* able to afford the movies; he meant that he had *never* been able to afford to go to the movies:

DEFENSE COUNSEL: "Never go to the beach in the summer?"
CORSETTI: "No. I don't like beach."
. . .
DEFENSE COUNSEL: "Have you ever been to the movies?"
CORSETTI: "No."
DEFENSE COUNSEL: "Never been to the movies?"
CORSETTI: "No. I can't afford to go to movies."

court. It is puzzling to me exactly when the defendant Stone Company is now "entitled as a matter of right" to the admission of collateral source evidence. *Ante* at 18. I expect that the trial judges will face the same conundrum.

Because, at the very least, the record is ambiguous, I would accord substantial deference to the trial judge. What in fact the court is doing is exercising its discretion to determine an evidentiary question committed to the discretion of the trial judge.[7] The court's action is inappropriate. The fact that an appellate court would exercise its discretion differently does not justify ordering a new trial. I therefore would affirm the judgment.

---

[7] As I read the court's opinion, if the plaintiff on retrial simply omits those comments considered provocative by the court, the judge has discretion still to exclude the collateral source evidence at the second trial. Because the evidence of malingering was thoroughly developed at the first trial, the insistence on a second trial wherein a jury may consider substantially the same evidence seems pointless.