Garsh, J.
Plaintiff, Robert Mejia (“Mejia”), brings this action seeking damages under a statutory bond issued by defendant, United Casualty and Surety Insurance Company (“United”), to defendant, Merrimack Valley Exchange Corp. (“Merrimack”), pursuant to G.L.c. 169, §2. United now moves for partial summary judgment as to Mejia’s claims against it on the ground that the transactions between Mejia and Merrimack are not covered by the bond. For the following reasons, United’s motion for summary judgment is allowed.
BACKGROUND
On December 8, 1994, United issued Merrimack, as principal, a bond pursuant to G.L.c. 169 in favor of the Treasurer and Receiver General of the Commonwealth of Massachusetts, as obligee (the “Bond”). The Bond contains the following condition: “(I]f the said Merrimack . . . shall faithfully hold and transmit any money, or equivalent thereof, which shall be delivered to it (or them) for transmission to a foreign country, then this obligation shall be void; otherwise it shall remain in full force and effect.” The Bond further provides that “in the event of the insolvency or bankruptcy of the principal the full amount of this bond shall become due and be payable ... for the benefit of the persons making such deposits and of such persons as shall deliver money to it (or them) for transmission to a foreign country.”
From late July 1995 through early August 1995, Mejia delivered a number of checks in Dominican Republican pesos payable to a Merrimack employee in the Dominican Republic. Said checks were delivered in exchange for a number of checks in American dollars payable to Mejia’s sister, Nicaury Mejia, who jointly owned the account with Mejia into which the dollars were deposited. Mejia and Merrimack had been exchanging pesos for dollars in the Dominican Republic over a number of years. Mejia is in the business of buying and selling money. Mejia believed that the pesos he delivered to Merrimack in the Dominican Republic were used by Merrimack to pay people in the Dominican Republic the equivalent of the United States dollars that had been delivered to Merrimack in the United States for transmission to people in that foreign county, but Mejia does not, in fact, know what Merrimack did with the pesos.
The checks which Mejia received in the Dominican Republic from Merrimack during July and August 1995 were returned for insufficient funds. Merrimack is insolvent. Six of the nine checks which were returned for insufficient funds bear the same account number as that designated on Merrimack’s 1995 Application for a License to Engage in the Business of Receiving Deposits of Money for Transmission to Foreign Countries. The maker of those checks was Hector Exchange M.V.E.C.
With respect to all the dollars given to Merrimack in Massachusetts for transmission to named parties in the Dominican Republic, there is no evidence that Merrimack did not provide such parties in the Dominican Republic with pesos equivalent to all of the dollars that had been entrusted to Merrimack. Mejia is not aware of anyone in the Dominican Republic who failed to get his or her funds.
DISCUSSION
Summary judgment shall be granted where there are no material facts in dispute and the moving party is entitled to judgment as a matter of law. Cassesso v. Comm’r of Correction, 390 Mass. 419, 422 (1983); Community Nat’l Bank v. Dawes, 369 Mass. 550, 553 (1976); Mass.R.Civ.R 56(c). The moving party bears the burden of affirmatively demonstrating the absence of a triable issue and that the moving party is entitled to judgment as a matter of law. Pederson v. Time, Inc., 404 Mass. 14, 16-17 (1989). With respect to any claim on which the moving party does not have the burden of proof at trial, the movant may demonstrate the absence of a triable issue either by submitting affirmative evidence that negates an essential element of the opponent’s case or “by demonstrating that proof of that element is unlikely to be forthcoming at trial.” Flesner v. Technical Communications Corp., 410 Mass. 805, 809 (1991); Kourouvacilis v. General Motors Corp., 410 Mass. 706, 716 (1991). “If the moving party *2 establishes the absence of a triable issue, the party opposing the motion must respond and allege specific facts which would establish the existence of a genuine issue of material fact in order to defeat [the] motion . . .” Pederson, 404 Mass. at 17.
General Laws c. 169, the statute governing “Receipts of Deposits for Transmittal to Foreign Countries,” is applicable to “all persons who engage or are financially interested in the business of receiving deposits of money for the purpose of transmitting the same or equivalents thereof to foreign countries ...” G.L.c. 169, §1. Chapter 169 requires every person subject to the statute to deliver a bond to the state treasurer in a sum equal to twice the average weekly amount of money or equivalents thereof transmitted to foreign countries by such person. G.L.c. 169, §2. According to the statute, the bond is to be “conditioned upon the faithful holding and transmission of any money or equivalents thereof which shall have been delivered to such person for transmission to a foreign country and, in the event of the insolvency or bankruptcy of the principal, upon the payment of the full amount of such bond ... for the benefit of such persons as shall have delivered money or equivalents thereof to said principal for the purpose of transmitting the same to a foreign country.” G.L.c. 169, §2.[3] The statute further provides that “[a]ll money received for transmission to a foreign country by any licensee shall be forwarded to the person to whom the same is directed within seven days following receipt thereof.” G.L.c. 169, §8.
Interpretation of a statute is a question of law for the court. Corsetti v. Stone, 396 Mass. 1, 12 (1985); Casey v. Massachusetts Electric Co., 392 Mass. 876, 879 (1984). A statute should be interpreted “according to the intent of the legislature ascertained from all its words construed by the ordinary and approved usage of the language, considered in connection with the cause of its enactment, the mischief or imperfection to be remedied and the main object to be accomplished, to the end that the purpose of its framers may be effectuated.” Champagne v. Champagne, 429 Mass. 324, 326 (1999).
Similarly, the meaning of the Bond presents a question of law for the court. A surety’s bond is a contract which “sets the limits of the surety’s liability." Peerless Insurance Co. v. South Boston Storage & Warehouse, Inc., 397 Mass. 325, 327 (1986). Contract interpretation is generally a question of law. See Allstate Insurance Co. v. Bearce, 412 Mass. 442, 446-47 (1992). The “terms and conditions upon which one becomes a surety are to be ascertained from the instrument creating that undertaking construed in reference to the usages of business, the object sought to be accomplished, the relations of the parties to each other, and the attending circumstances.” Roger Williams Grocery Co. v. Sykes, 357 Mass. 485, 488-89 (1970), quoting Miller v. Perry, 333 Mass. 155, 158 (1955).
Contrary to Mejia’s contention, neither the statute nor the Bond encompasses the type of transactions which occurred between Merrimack and Mejia, that is, a business dealing conducted in the Dominican Republic consisting of exchanging — buying and selling— pesos for dollars. Instead, the governing statute and Bond cover transactions whereby a person deposits money with an authorized money transmitter, who is obliged to transmit the same or its equivalent to a foreign country. See In re H. Slobodkin, Inc., 247 Mass. 27, 28 (1923) (corporation gave a bond to the state treasurer, as required by G.L.c. 169, §2, to secure “those of its creditors” who delivered money to it for safekeeping and for transmission to foreign countries). The main object of the statute is “to protect the people of [Massachusetts] from being victimized by unscrupulous practices by persons receiving money for transmission to foreign countries and to establish a minimum level of fiscal responsibility and corporate integrity for all entities engaged in the business of receiving money for transmission to foreign countries without regard to the method of transmission.” Cal.Fin.Code §1800(a) (West 1999).[4] Undoubtedly, the mischief sought to be remedied by the bond requirement contained in c. 169, §2 is the misappropriation of funds given to persons under the understanding that the money or its equivalent will be transmitted to designated persons in a foreign country.[5]
The plain language of the statute and the Bond demonstrate that, although Merrimack is subject to the requirement contained in section 2 that a bond be posted, Mejia is not entitled to recover on the bond that Merrimack was required to provide to the state treasurer. The Bond is for the benefit of those persons who have delivered money or its equivalents to Merrimack for the purpose of transmitting the same to a foreign country. Even assuming the doubtful proposition that a beneficiary of the Bond could be a person who made a delivery of funds outside Massachusetts— indeed, outside the United States — to Merrimack for transmission from outside the United States to a foreign country, Mejia does not qualify as such a beneficiary. In response to United’s demonstrating that proof of that element is unlikely to be forthcoming at trial, Mejia has not produced any specific facts which would establish the existence of a genuine issue of material fact as to the plaintiffs having delivered pesos to Merrimack’s agent in the Dominican Republic “for the purpose” of Merrimack transmitting the same “to a foreign country.” Rather, Mejia sold pesos to Merrimack for dollars, with no specification as to what Merrimack was to do with the pesos. Since Mejia did not give Merrimack money “for the purpose,” or with the specific intent, of sending that money or its equivalent “to a foreign country” — a country other than the one he was in when he gave the pesos to Merrimack— *3 he is not a beneficiary of the Bond and cannot recover on the Bond.
The fact that some of the checks delivered to Mejia which did not clear were drawn on a designated chapter 169 account that is to be used solely for the transmission of money to foreign countries, 209 Code Mass. Regs. §44.07(1), does not entitle Mejia to recover under the Bond. The Commissioner of Banks is authorized to take action when there has been a violation of chapter 169. G.L.c. 169, §§12-16. Nothing in the governing statute nor the Bond gives Mejia, by virtue of any misuse by Merrimack of a designated c. 169 account, a right to recover under the Bond which he would not otherwise have. “The fact that [the] bond is required by statute does nothing to alter the settled principles of contract and suretyship law. That this is a statutory bond does not ‘enlarge the risk’ which the bonding company has undertaken ... A surety ‘cannot be holden beyond the fair scope of [its] engagement, as intended by the parties when undertaken.’ ” Peerless Insurance Co., 397 Mass. at 327. See also Continental Bronze Co. v. Salvo & Armstrong Steel Co., 8 Mass.App.Ct. 799, 802 (1979) (subcontactor’s bond written in strict conformity with a statute expressly providing that said bond “[s]hall be for the benefit of the general creditor” is for the benefit of the general contractor alone).
Apart from Mejia’s failure to produce evidence that he is within the range of beneficiaries enumerated either in the Bond or in the statute, the undisputed facts also demonstrate that Mejia is unable to meet his burden of showing that the condition resulting in an obligation to pay under the Bond was not met, namely that Merrimack did not faithfully transmit money or its equivalents thereof which were delivered to it for transmission to a foreign country.[6] G.L.c. 169, §2. As discussed above, there is no evidence that pesos were delivered by Mejia to Merrimack “for transmission to a foreign country.” The intent to transmit money to a foreign country must be directly connected to the action of delivering money to Merrimack. The deliveries are required to be for the express purpose of transmitting the same, that is, those deposits or their equivalents, to a foreign country. Furthermore, there is no evidence that anyone delivered dollars to Merrimack outside the Dominican Republic with instructions to transmit those dollars to Mejia in the Dominican Republic. Finally, there is no evidence that the peso equivalents of the dollars that may have been deposited with Merrimack in Massachusetts for transmittal to persons in the Dominican Republic were not, in fact, paid out to such persons in the Dominican Republic. The specific United States currency, paper and coins, deposited with Merrimack need not be sent to a foreign country. The use of the term “equivalents” in the statute and the Bond means that the persons in a foreign country to whom the money is being directed may be paid in foreign currency and not United States dollars. That Merrimack may have satisfied its obligation to its Massachusetts depositors by purchasing pesos in the Dominican Republic does not entitle Mejia to recover on the Bond simply because Merrimack is in the business of receiving deposits for transmission to foreign countries and because the pesos purchased by Merrimack in the Dominican Republic most likely reached persons as part of Merrimack’s business regulated by chapter 169.
Mejia’s reading of the statute and Bond is strained. Neither should be construed to create an obligation which cannot be found in the plain meaning of the words used therein and which is not necessary to effectuate the purpose of chapter 169.[7] Since Mejia’s business dealings with Merrimack in the Dominican Republic are not of the type governed by c. 169 and secured by the Bond, Mejia is not entitled to pursue his action against the surety.
ORDER
For the foregoing reasons, it is hereby ORDERED that United Casualty and Surety Insurance Company’s Motion for Partial Summary Judgment is ALLOWED dismissing Robert Mejia’s claims against it.

An action to recover on a bond issued in accordance with chapter 169 may be brought by an aggrieved party in the Superior Court. G.L.c. 169, §5.

Califomia’s statute, Cal.Fin.Code §1800 et seq. (West 1999), is very similar to G.L.c. 169. It provides that “[n]o person shall engage in the business of receiving money for the purpose of transmitting the same or its equivalent to foreign countries without first obtaining a license from the commissioner." Cal.Fin.Code §1800.3(a) (West 1999). It further provides that such licensees must deposit cash or securities with the Treasurer, Cal.Fin.Code §1811(a) (West 1999), or deliver to the commissioner a bond in lieu thereof, “conditioned upon the timely and proper delivery of all transmission money received by such licensee or its agents for such purpose.” Cal.Fin.Code §1812 (West 1999).

See Cal.Fin.Code § 1800(b) (West 1999) ("The Legislature finds and declares that California has a large and diverse population many of whom are concerned with the financial plight of people remaining in the countries which they left... In an effort to transmit money to their friends and relatives, these persons give their money to persons under the precept that the money or its equivalent will be immediately transmitted to the designated foreign country. The money is frequently misappropriated or never transmitted").

Mejia’s argument that c. 169 should be more broadly construed based upon definitions of “transmitting money,” “foreign money transmitter” or “money transmission” found in the statutes of some other jurisdictions ignores the fact that the wording of those other statutes markedly differs from G.L.c. 169. Arizona, for example, defines a "money transmitter” as “a person who is located or doing business in [Arizona] . . . who . . . : (a) Sells or issues payment instruments, (b) Engages in the business of receiving money for the transmission of or transmitting money, (c) Engages in the business of exchanging payment instruments or money into any form of money or payment instrument, (d) Engages in the business of receiving money for obligors for the purpose of paying that obligor’s bills, invoices or accounts . . .” Ariz.Rev.Stat.Ann. §6-1201(10) (West 1999). Further, Arizona defines “transmit *4 ting money” as “the transmission of money by any means including transmissions within this country or to or from locations abroad by payment instrument, wire, facsimile or electronic transfer, courier or otherwise.” Ariz.Rev.Stat.Ann. §6-1201(15) (West 1999). Chapter 169 does not apply to all the types of businesses that Arizona’s relevant statute does, Ariz.Rev.Stat.Ann. §6-1201(10) (West 1999), and c. 169 is explicitly limited to delivery of money to a person for transmission to a foreign country. Arizona's “Money Transmission” statute, by contrast, covers instances where money is transmitted within the United States or to or from a foreign country. Arizona requires that the bond which a money transmitter must post be "payable to any person injured by the wrongful act, default, fraud or misrepresentation of the licensee Ariz.Rev.Stat.Ann. §6-1205B (West 1999); whereas, the governing Massachusetts law states that the bond shall be paid “for the benefit of such persons as shall have delivered money or equivalents thereof to said principal for the purpose of transmitting the same to a foreign country.” G.L.c. 169, §2. Illinois’ relevant statute is also much broader than c. 169. See 205 Ill.Comp.Stat.Ann. 657/5 (West Supp. 1999). It defines “transmitting money” as “the transmission of money by any means, including transmissions to or from locations within the United States or to and from locations outside of the United States by payment instrument, facsimile or electronic transfer, courier or otherwise.” Id. Illinois’ statutory scheme also requires persons licensed under 205 Ill.Comp.Stat.Ann. 657/10 (West Supp. 1999) to maintain a bond ”run[ning] to the State of Illinois for the benefit of any claimant against the applicant or licensee with respect to the receipt, handling, transmission, and payment of money by the licensee or authorized seller in connection with the licensed operations.” 205 Ill.Comp.Stat.Ann. 657/30(a) and (c) (West Supp. 1999). By contrast, the statute which is most similar to G.L.c. 169, namely Cal.Fin.Code §1800 et seq., defines “transmission money” as “money received in [California] by a licensee for transmission to a foreign country, or any equivalent into which the money is converted, from the time the money is received for transmission to a foreign country until the time the transmission of the money in accordance with the agreement of the licensee with the customer is completed, or, if the transmission is not completed, until such time as the money is repaid to the customer." Cal.Fin.Code §1800.5(b) (West 1999). Additionally, “receiving money for transmission” is defined as “receiving money for the purpose of transmitting the same or its equivalent to foreign countries.” Cal.Fin.Code §1800.5(a)(l) (West 1999). Further, California requires licensees to deliver a bond in lieu of cash or securities to the commissioner “conditioned upon the timely and proper delivery of all transmission money received by such licensee or its agents for such purpose." Cal.Fin.Code §1812 (West 1999). Similar to Massachusetts, “the proceeds of any [such] bond . . . shall constitute a trust fund for the benefit of such persons as shall deliver to any such licensee or its agent money for transmission.” Cal. Fin. Code §1813 (West 1999).

Cf. 6 Op.Atty.Gen. 1922 at 554-57 (J. Weston Allen) (the business of selling foreign currency on an installment plan and issuing certificates therefor is not the business of receiving deposits of money for transmission abroad regulated by G.L.c. 169, §1).