Brassard, J.
BACKGROUND
On January 28, 2000, this matter was before the court for a hearing on the defendant’s, Town of Tyngsborough, motion for judgment notwithstanding the verdict. This action was tried before the court and a jury by the plaintiffs against the defendants remaining in the case at the time of trial which included the Department of Social Services, Judge Baker Children’s Center, Inc., MaryR. Young, Julie A. Monarch, Susan Pease and the Town of Tyngsborough (the “Town”). The jury returned a verdict against the Town and awarded five million dollars in damages to Cheryl Lamare (Ms. Lamare), two million dollars in damages to Ellas Voulgarelis (Ellas) and two million dollars in damages to Demetra Voulgarelis (Demetra).[1] The jury returned a verdict against the plaintiffs with respect to the other remaining defendants. Subsequent to the verdict the Town filed, and the court allowed, a motion to conform judgment to M.G.L.c. 258, §2 which reduced each plaintiffs award to the statutory cap of $100,000.00 without interest and costs.
This action, as it relates to the Town of Tyngsborough, was commenced in 1992 by Cheryl Lamare following the 1989 abduction and transportation of her two minor children, Ellas and Demetra Voulgarelis to Greece by their father Stanley Voulgarelis. Ellas was recovered by Ms. Lamare in 1990 and has resided with Ms. Lamare since her recovery. Demetra has not been recovered by Ms. Lamare and remains in Greece. At the time of the abduction the children were in the custody of the Department of Social Services and their father, Stanley Voulgarelis, had no legal custody of the children.
Ms. Lamare alleges, among other things, that the Police Department of the Town of Tyngsborough failed to take action to prevent Stanley Voulgarelis from leaving the country with the two children. Specifically, Ms. Lamare alleges that the Tyngsborough Police made explicit and specific assurances to Ms. Lamare that they would contact the Kennedy Airport in New York to try to prevent Mr. Voulgarelis from leaving the country in the event that he attempted to leave from New York City. The Town alleges that no such assurances were made, and in fact did not contact Kennedy Airport. This action against the Town of Tyngsborough *443 arises from the fact that Mr. Voulgarelis left the United States for Greece from Kennedy Airport at 9 p.m. on the day of the abduction, approximately 5 hours after the police were notified. Ms. Lamare argues that the police department failed in their investigation and through their actions to prevent Mr. Voulgarelis from leaving the United States with the two children.
The Town challenges the jury verdict as to all three plaintiffs based on six grounds. First, the Town asserts that the plaintiffs presented no evidence of causation. Second, the Town argues that there was no evidence of a specific and explicit assurance. Third, the Town contends that there was no evidence of detrimental reliance. Fourth, the Town alleges a failure of presentment under the Massachusetts Tort Claims Act. Fifth, the Town argues that there was no evidence of damages to Demetra. And, finally, the Town contends that Ms. Lamare has no direct claim for emotional distress and that the children and the mother have no consortium claims against the Town. Plaintiffs argue that the defendant’s motion must be denied because there is sufficient evidence in the record from which the jury could have rendered its verdict for each plaintiff.
FACTS
Based upon all of the evidence, the jury could have found the following facts. Ms. Lamare was married to Stanley Voulgarelis and during their marriage they had two children, Ellas and Demetra. Mr. Voulgarelis filed for divorce after which legal and physical custody of their children was awarded to Ms. Lamare with visitation rights granted to Mr. Voulgarelis. After certain allegations were raised against Mr. Voulgarelis, the Department of Social Services took legal custody of the children, and Ms. Lamare retained physical custody of the children.
Ms. Lamare was concerned with the possibility the Mr. Voulgarelis would abduct the children and flee to Greece because Mr. Voulgarelis had dual citizenship, the family had gone to Greece earlier and Mr. Voulgarelis had the children’s passports. Ms. Lamare communicated these concerns to Tim Smith, the DSS social worker handling Ms. Lamare’s case. The Friday before the abduction, Ms. Lamare was told by Mr. Smith that Delia Almeida would supervise Mr. Voulgarelis’s visit with the children the following Sunday. On Sunday, October 29, 1989, Mr. Voulgarelis forced Ms. Almeida out of his vehicle while driving with the children to a restaurant.
Ms. Lamare learned that Mr. Voulgarelis abducted the children during the early afternoon on the day of the abduction and called the Tyngsborough Police.
Officer Boulet and Officer Walsh of the Tyngsborough Police responded to Ms. Lamare’s apartment at approximately 4:10 p.m. on October 29, 1989. At approximately the same time, Sergeant Larkham was notified of the abduction by the police dispatcher while he was finishing a private detail assignment. Sergeant Larkham told the dispatcher to immediately put out an all points bulletin on Mr. Voulgarelis, which was done. Ms. Lamare went to the police station with Officer Walsh at approximately 5:00 p.m. Ms. Lamare returned to her apartment between 5:00 and 5:15. At 5:15 p.m. Officer Walsh and Sergeant Larkham returned to the plaintiffs apartment and spoke with Ms. Lamare about possible escape routes.
Lisa Andrews (“Ms. Andrews’’) testified that Ms. Lamare provided Officers Boulet and Walsh with information regarding the Department of Social Services’ (“DSS”) legal custody of the children and Ms. Lamare’s physical custody of the children. Ms. Andrews testified that she and Ms. Lamare went to the police station at about 5:00 p.m. Ms. Andrews told the officers that she thought it was possible that Mr. Voulgarelis would go to Canada. Ms. Andrews testified that Ms. Lamare said to the police officers “please call New York, he is going to New York. There are flights to Greece every night” and that the officers did not respond to this request. Ms. Andrews testified that during the first meeting with Officer Walsh and Sergeant Larkham, the officers said that a call would be made to New York.
Ms. Lamare testified that she told the police that Mr. Voulgarelis would fly out of Kennedy Airport in New York. Ms. Lamare further testified that when she saw the police supervisor she again mentioned Kennedy Airport and that the officers said that they would contact the New York authorities and would fax what was needed. On cross-examination Ms. Lamare testified that while at her apartment with the police officers, there was no discussion of airports. On re-direct Ms. Lamare testified that while the missing persons report was being typed in the outer office of the police station, she mentioned the possibility of Kennedy Airport “several times.”
Officer Walsh testified that after he met with Ms. Lamare at her apartment at approximately 4:10 p.m., Officer Walsh and Ms. Lamare went to the police station at approximately 5:00 p.m. Officer Walsh testified that on his second visit to Ms. Lamare’s apartment, Ms. Lamare told Officer Walsh that Mr. Voulgarelis might go to Greece via Montreal. Officer Walsh testified that he never discussed Kennedy Airport with Ms. Lamare. Officer Walsh testified that he and Officer Boulet completed the missing persons reports and did not see Ms. Andrews at the police station during this time. Officer Walsh testified that he delivered the missing persons reports to the dispatcher to enter them into National Crime Information Center (NCIC) system and had no further contact with Ms. Lamare.
Officer Boulet testified that prior to October 29, 1989, he had responded to Ms. Lamare’s apartment on July 6, 1989, at which time he overheard Ms. Lamare say that Mr. Voulgarelis may take the children *444 to Greece. Officer Boulet testified that it was his impression that Mr. Voulgarelis might take a flight from Logan or from Manchester, New Hampshire and, in fact, relayed information to the Manchester Airport. Officer Boulet testified that the State Police at Logan were contacted and that he “understood” that Nashua, New Hampshire and the FBI had been contacted.
After meeting with Ms. Lamare at the apartment, Sergeant Larkham returned to the police station and contacted the Massachusetts State Police at Andover. The state police trooper told Sergeant Larkham that he would contact the Logan state police and he suggested that the FBI should be contacted. Sergeant Larkham next contacted someone at DSS and an agent in the Boston office of the FBI. Sergeant Larkham received information from the DSS lawyer about the legal custody of the children at approximately 6:15 p.m. At this time Sergeant Larkham teletyped and faxed materials to the state police and the FBI.
Sergeant Larkham spoke with Ms. Lamare in his office at approximately 6:20 or 6:25 p.m. and told Ms. Lamare what had occurred to that point and requested photographs of the children. The missing persons reports were sent to the NCIC and a “stop and hold” request was sent to the various authorities. Sergeant Larkham testified that the focus of the investigation was on New Hampshire, Vermont, Maine and the Canadian border and that Kennedy airport was never a part of the discussion. Before 7:00 p.m. Ms. Lamare delivered photographs of the children and Mr. Voulgarelis to Sergeant Larkham. Sergeant Larkham faxed the photographs to the state police at Andover and Logan airport. Sergeant Larkham met with Ms. Lamare again at 7:45 p.m. in his office. Ms. Lamare asked Sergeant Larkham if the border patrol had been notified and he told her the teletype had been sent out. Ms. Lamare requested verification and Sergeant Larkham then contacted the FBI agent who confirmed that U.S. border points would be notified.
The state troopers checked flights leaving from Logan airport to Greece on October 29, 1989, and found that only one PanAm flight departed that evening with no passengers matching Mr. Voulgarelis’s description on the flight. Sergeant Larkham continued to work on the abduction until midnight. Several days later the parties learned that Mr. Voulgarelis and the children had taken a flight to Greece from JFK at approximately 9:10 p.m. on October 29, 1989.
DISCUSSION
The standard of review for a judgment notwithstanding the verdict is the same as that for a directed verdict. See Service Publications Inc. v. Goverman, 396 Mass. 567, 571 (1986). The facts in the record must be reviewed in a light most favorable to the plaintiff. See MacCormack v. Boston Edison Co., 423 Mass. 652, 659 (1996). “A jury’s verdict must be sustained if a plaintiff has presented any evidence from which the jury could have made their findings, and we assume all the evidence offered by the plaintiffs in support of their case to be true and do not assess witness credibility or the weight of the evidence, but seek to determine whether there is truly ‘but one conclusion as to the verdict that reasonable men could have reached.’ ” MacCormack, 423 Mass. at 659 (emphasis added) (citing Young v. Atlantic Richfield Co., 400 Mass. 837, 841 (1987), cert. denied, 484 U.S. 1066 (1988)); Corsetti v. Stone Co., 396 Mass. 1, 21 (1985); Margeson v. Town Taxi, Inc., 266 Mass. 192, 194 (1929). The plaintiff may not recover when any essential element is left to conjecture, surmise or hypothesis. White Spot Construction Co. v. Jet Spray Cooler, Inc., 344 Mass. 632, 635 (1962).
Causation
The “question of causation is generally one of fact for the jury. Zezuski v. Jenny Mfg. Co., 363 Mass. 324, 327 (1973). A plaintiff need only show ‘that there was greater likelihood or probability that the harm complained of was due to causes for which the defendant was responsible than from any other cause.’ ” Irwin v. Ware, 392 Mass. 745, 765 (1984) quoting Mullins v. Pine Manor College, 389 Mass. 47, 58 (1983), quoting Carey v. General Motors Corp., 377 Mass. 736, 740 (1979). In instances “. . . where the public employee’s purported negligence stems from a failure to prevent or to mitigate a harmful situation that he did not cause, a plaintiffs burden of establishing proximate cause will be significant.” Jean W. v. Commonwealth, 414 Mass. 496, 511 (1993).
The Town argues that there was no evidence of causation presented at trial. The Town contends that the plaintiff had the burden to show what the New York authorities would have done had they located Mr. Voulgarelis before he departed from J.F.K. International Airport. The Town asserts that, because the plaintiff failed to present expert evidence on New York law or law enforcement, the plaintiff cannot satisfy her burden of causation.[2] The Town argues that, without showing that the New York authorities would have detained Mr. Voulgarelis had the defendant contacted them, the Town’s inaction could not have caused the plaintiffs harm. In support of its position, the Town notes that there was no arrest warrant or criminal charges pending against Mr. Voulgarelis and that Mr. Voulgarelis had passports for both children.
The plaintiff argues that there is sufficient evidence in the record from which the jury could conclude that probable cause existed to arrest Mr. Voulgarelis based on the Town’s investigation and that the New York authorities would have arrested Mr. Voulgarelis had they been notified and had they located him. The plaintiff asserts that Sergeant Larkham and Chief Cronopoulis testified that notification was sent to the Massachusetts State Police, the FBI and other out-of-state authorities because probable cause existed; and that probable cause is sufficient to detain or arrest an individual within or outside of the Commonwealth of *445 Massachusetts. In support other position, the plaintiff notes that although there was no arrest warrant or pending criminal charges against Mr. Voulgarelis on Sunday, the day of the abduction, the police secured an arrest warrant on Monday, the day following the abduction. Furthermore, the plaintiff notes that Mr. Voulgarelis did not have legal or physical custody of the children, thus, if he were abducting the children any authority would have had probable cause to detain him.
After careful review of the record, this court concludes that the plaintiff presented sufficient evidence from which a jury could conclude that the defendant established probable cause to detain Mr. Voulgarelis through its investigation and that any law enforcement authority provided with the information establishing probable cause could have detained Mr. Voulgarelis based on that information. Therefore, the jury could conclude that the Town’s failure to contact the New York authorities caused the plaintiffs harm.
At trial, Sergeant Larkham testified that the FBI advised the Tyngsborough Police that it would assist the department in “a stop and hold notification to agencies within their jurisdiction.” Sergeant Larkham testified that the FBI requested the court documents establishing legal custody of the children because those documents would be important in obtaining an arrest warrant once Mr. Voulgarelis was detained. However, Sergeant Larkham also testified that the FBI did not delay sending out notification pending receipt of the custody documents. Sergeant Larkham further testified that based on his knowledge of probable cause and the information he would have been able to provide based on his investigation, an out-of-state authority could have detained Mr. Voulgarelis if apprehended.
Chief Cronopoulis testified that the Tyngsborough Police sent out notification to other law enforcement entities for the purpose of stopping Mr. Voulgarelis and holding him while the department arranged to get a warrant. Sergeant Larkham testified that the Tyngsborough Police did, in fact, obtain an arrest warrant the day after the abduction. Sergeant Larkham further testified that an arrest warrant could not be obtained the day of the abduction, even though probable cause had been established, because the abduction occurred on a Sunday and, at the time of the abduction in 1989, the courts had no on-duty magistrate that could issue the warrant before Monday morning. Therefore, there is sufficient evidence in the record from which a jury could conclude that probable cause existed to detain Mr. Voulgarelis based on the Town’s investigation and that the New York authorities could have arrested Mr. Voulgarelis had they been notified and had they located him. The Town’s motion for judgment nothwithstanding the verdict is DENIED on the issue of causation.
Specific and Explicit Assurances
Defendant argues that there was no evidence of specific and explicit assurances given to Ms. Lamare by the Tyngsborough Police. M.G.L.c. 258 provides immunity from personal liability for public employees in the scope of their employment. A public employer, however, can be held responsible for the actions of a public employee. In general, a public employer is liable for personal injury caused by the negligent or wrongful act or omission of any public employee while acting within the scope of his office or employment, in the same manner and to the same extent as a private individual under like circumstances. See M.G.L.c. 238, §2.
There are exclusions that apply to this rule. A public employer is not liable for “any claim based on an act or a failure to act to prevent or diminish the harmful consequences of a condition or situation, including the violent or tortious conduct of a third person, which is not originally caused by the public employer or any other person acting on behalf of the public employer.” See M.G.L.c. 238, §10(j). If this exclusion applies, the public employer is not liable for the claim even if it was negligent. See generally, Joseph Glannon, Liability for “Public Duties” Under the Tort Claims Act: The Legislature Reconsiders the Public Duty Rule, 79 MASS.L.REV. 17, 19 (1994).
There is another exclusion to the potential liability of a public employer in the case of a police department. A police department may not be held liable solely on the basis of any claim for the failure to establish a particular protection service, or if police protection is provided, for failure to provide adequate police protection. A police department also may not be held liable for failure to prevent the commission of crimes, or failure to investigate, detect or solve crimes, or failure to arrest or detain a suspect. See M.G.L.c. 258, §10(h).
There is an exception to these exclusions. If a public employer, in this case the Police Department of the Town of Tyngsborough, made explicit and specific assurances of safety and assistance to Ms. Lamare, and injury resulted in part from reliance on those assurances, the public employer can be held liable. See M.G.L.c. 258, §10(j)(1). To find that assurances were “explicit,” there must be a spoken or written assurance, not one implied from the conduct of the parties or the situation. To be “specific,” the terms of the assurance must be definite, fixed, and free from ambiguity. Lawrence v. The City of Cambridge, 422 Mass. 406 (1996). These assurances must go beyond general representations that investigation or assistance will be or has been undertaken.
The Town claims that there were no specific or explicit assurances given to Ms. Lamare that Kennedy Airport would be contacted. The Town argues that even if the jury found that Ms. Lamare was told that Kennedy Airport would be contacted, she was not told when, and this lack of temporal specificity prevents *446 the assurance from reaching the level of “specific and explicit.” The Town cites Lawrence to support its argument that a specific time frame must be given for an assurance to be specific enough to constitute an exception to the Tort Claims Act. In Lawrence, plaintiff was told he would have police protection when he closed his store at night. He was not, however, told for how long he would receive such protection. The Court found that this durational element was a critical part of the assurance. The Court held that the duration could not be implied because the statute specifically prohibits this type of implied term in an “explicit and specific” assurance. Lawrence at 411.
The Town also cites the article by Professor Glannon that gives an example of an assurance made by a firefighter. Although the example was given in the context of determining reliance upon an assurance, it is also relevant here. In the example the firefighter told a father not to rescue his child because the fire department would do so. This assurance can be distinguished from the assurance discussed in Lawrence. In Lawrence, the court found that a durational element was required of an assurance. In the firefighter hypothetical, no durational element was given but the assurance should be considered sufficiently specific. The circumstances in the firefighter hypothetical clearly and fairly demonstrate that the action would be taken as soon as possible.
The present case can be analogized to this hypothetical. Ms. Lamare’s children had been kidnapped and the police were aware that her husband was a flight risk. The logical conclusion would be that he would attempt to flee the country with the children as soon as possible. Under these emergency circumstances, it is reasonable to conclude that the assurance of assistance, which the jury found was given, would be carried out at once. Therefore, the Town’s motion for judgment notwithstanding the verdict as it pertains to specific and explicit assurances is DENIED.
Reliance
The Town argues that, even if there was a specific and explicit assurance, there was no reliance on the assurance. The “specific assurances” exception of 10(j)(1) states that the exception does not apply to “any claim based upon explicit and specific assurances . . . provided that the injury resulted in part from reliance on those assurances.” M.G.L.c. 258, §10(j)(l). In other words, plaintiff has to show not only that representations were made, but that she acted in reliance on them, and that, had she not relied, the injury would not have occurred. See Joseph Glannon, Liability Jor “Public Duties” Under the Tort Claims Act: The Legislature Reconsiders the Public Duty Rule, 79 MASS.L.REV. 17(1994).
The Town argues that no evidence indicated that the alleged assurance by the Tyngsborough police caused Ms. Lamare to refrain from doing something that would have resulted in her children being stopped at Kennedy Airport.
The legal doctrine of reliance has received attention in the field of contracts, particularly with respect to the doctrine of promissory estoppel. The Appeals Court has endorsed the doctrine of promissory estop-pel, holding that a promise may be enforceable if the promisee reasonably and detrimentally relies on it. See Loranger Construction Corp. v. E.F. Hauserman Co., 376 Mass. 757, 760-61 (1978). The Court has explicitly stated that forbearance can constitute reliance. See id. at 760-61. Ms. Lamare testified that, based on her conversation with Officer Walsh, she believed the New York airport was being contacted. She then said she did not personally contact authorities in New York because she “had no reason to think that (she) should.” In earlier testimony, Sergeant Larkham of the Tyngsborough Police had recounted a meeting with Ms. Lamare in which she repeatedly sought assurance that the border points had been or would be notified. Based on this evidence, a jury could reasonably conclude that (1) Ms. Lamare refrained from personally contacting New York authorities based on the assurances she received from the Tyngsborough police, (2) that her inaction constituted reliance by forbearance, and (3) that her injury resulted in part from her reliance. Therefore, the Town’s motion for judgment notwithstanding the verdict as it pertains to reliance is DENIED.
Presentment
The adequacy of the 1991 presentment letter has been questioned by the defendant. The Town claims that there was no reference to promises or assurances in the letter and therefore the letter is inadequate. The Town points out that the plaintiffs complaint was amended in 1995 to include a claim of specific and explicit assurances to conform with a 1993 amendment to the Massachusetts Tort Claims Act (M.G.L.c. 258). The 1993 amendment precluded certain claims against a public employer with respect to its police services. The amendment established that a police department may not be held Háble solely on the basis of any claim for the failure to estabhsh a particular protection service, or if poüce protection is provided, for failure to provide adequate poHce protection. A police department also may not be held liable for failure to prevent the commission of crimes, or failure to investigate, detect or solve crimes, or failure to arrest or detain a suspect. See M.G.L.c. 258, §10(h).
The statutory exception to this exclusion is that if a police department made expHcit and specific assurances of safety and assistance, and injury resulted in part from reliance on those assurances, the police department can be held Hable. See M.G.L.c. 258, §100X1).
Upon review of the presentment letter, the court finds that although the assurance to call New York’s Kennedy Airport was not present in so many words, *447 the allegations in the letter were sufficient for the purposes of a presentment letter. The purpose of presentment is to ensure “that the responsible public official receives notice of the claim so that that official can investigate to determine whether or not a claim is valid, preclude payment of inflated or nonmeritorious claims, settle valid claims expeditiously, and take steps to ensure that similar claims will not be brought in the future.” Gilmore v. Commonwealth, 417 Mass. 718, 721-22 (1994). “Without actual presentment in strict compliance with the statute, the executive officer with the authority to settle the claim could not be assured of an adequate opportunity to investigate the surrounding circumstances of that claim in order to determine whether an offer of settlement should be made.” Weaver v. Commonwealth, 387 Mass. 43, 47 (1982).
The court concludes that no prejudice was caused to the Town because reasonable notice was given in the letter and there was sufficient opportunity to investigate. The absence of prejudice is underscored by the fact that at trial police officers testified forcefully that no assurance had been given by the police to Ms. Lamare. Under all of the circumstances presented, including the allegations of the 1991 presentment letter, the 1993 amendment to M.G.L.c. 258, the amendment of the complaint in 1995, and the lack of prejudice, the court concludes that the presentment letter was in compliance with the statute. Therefore, the Town’s motion for judgment notwithstanding the verdict as it pertains to the presentment letter is DENIED.
Emotional Distress: Demetra Voulgarelis
In order to recover for negligent infliction of emotional distress a plaintiff must prove the following: (1) negligence; (2) emotional distress; (3) causation; (4) physical harm manifested by objective symptomatol-ogy; and (5) that a reasonable person would have suffered emotional distress under the circumstances of the case. Payton v. Abbott Labs, 386 Mass. 540, 557 (1982). “While no longer considering the attendant physical harm as a necessary condition of a cognizable claim for the negligent infliction of emotional injuries, we still require(d) objective corroboration of the emotional distress alleged.” Migliori v. Airborne Freight Corp., 426 Mass. 629, 631-32 (1998). In addition to cases where a plaintiff claims emotional distress that is directly caused by the defendant’s negligence, the court has also recognized a cause of action for negligent infliction of emotional distress in the so-called bystander cases. The court has imposed relational, temporal and spatial limits in the context of bystander liability so that “Only a bystander plaintiff who is closely related to a third person directly injured by a defendant’s tortious conduct, and suffers emotional injuries as the result of witnessing the accident or coming upon the third person soon after the accident, states a claim for which relief may be granted.” Id. at 632. A parent who claims emotional distress “caused by negligently inflicted injuries to her child must witness the injury or come upon the injured child promptly after the injury.” Nancy P. v. D’Amato, 401 Mass. 516, 520 (1988).
The evidence presented to support Demetra’s emotional distress claim consisted of testimony by Ms. Lamare regarding her observations of her daughter, primarily during two of her visits to Greece. She testified that in approximately September 1990, she saw her daughter and talked with her. She also testified that several years after the abduction she visited her daughter at a monastery on two consecutive days, noting that on the first day her daughter did not recognize her and on the second day, with Demetra’s father present, the girl was vomiting. Ms. Lamare suggested that the change in her daughter’s demeanor and her illness were attributable to stress because of her father’s presence, but without other evidence this amounts to speculation. Viewed in a light most favorable to the plaintiffs, Ms. Lamare’s testimony regarding Demetra would not permit a reasonable jury to conclude either that Demetra suffered emotional distress or that she exhibited any physical manifestation of emotional distress. Ms. Lamare presented no evidence that the symptoms she witnessed were related to Demetra’s abduction or to emotional distress relating to the abduction; she therefore presented no evidence from which a reasonable jury could conclude that Demetra suffered from emotional distress or the physical manifestation of emotional distress. In the absence of such evidence, the jury’s verdict in this instance was based on conjecture and speculation, and the only reasonable verdict would be a finding that no emotional distress occurred. Therefore, the Town’s motion for judgment notwithstanding the verdict as it pertains to Demetra Voulgarelis’ emotional distress claim is ALLOWED.
Emotional Distress: Cheryl Lamare
The Town argues that Ms. Lamare has no direct claim for emotional distress and that the only manner in which she can recover for emotional distress is under the theory of bystander liability. The Town asserts that Ms. Lamare’s bystander claim fails because there was insufficient evidence with respect to the temporal and spatial limits of the claim. Specifically, the Town argues that with respect to the temporal limit, Ms. Lamare’s claim fails because she did not learn of Mr. Voulgarelis’s departure from the United States until several days after the abduction. With respect to the spatial limit, the defendant argues that Ms. Lamare’s claim fails because she did not come upon her children promptly after Tyngsborough’s alleged negligence caused their injury.
The plaintiff argues that sufficient evidence has been presented from which a jury could conclude that: (1) the Town was negligent, (2) that Ms. Lamare suffered emotional distress, (3) that the Town’s negligence *448 caused Ms. Lamare’s emotional distress, (4) that the plaintiff demonstrated objective symptomatology and (5) that injury to her was foreseeable and that a reasonable person would have suffered emotional distress. The plaintiff also argues that the plaintiff has presented sufficient evidence from which a jury could conclude that the plaintiff suffered emotional distress as a bystander by satisfying the relational, temporal and spatial limits.
After careful review of the record, this court concludes that the plaintiff has presented sufficient evidence from which a jury could conclude that Ms. Lamare satisfied the requisite elements of her claim for negligent infliction of emotional distress directly caused by the Town. It is not necessary to discuss the bystander claim as it does not apply in this case. The plaintiff neither witnessed nor promptly came upon her children after they were allegedly injured by the Town.
The record demonstrates that sufficient evidence was presented to the jury from which it could conclude that the Tyngsborough Police Department’s negligence facilitated the departure of Ms. Lamare’s children and directly caused Ms. Lamare’s emotional distress. The plaintiff presented testimony that she told the Town that Mr. Voulgarelis would possibly leave the United States via New York and that the Town assured her that contact would be made with the New York authorities. The plaintiff presented evidence that neither the Town nor any other law enforcement agency in contact with the Town contacted the New York authorities and, as a result, Mr. Voulgarelis fled from JFK International Airport with the children. The plaintiff presented evidence that she has suffered and continues to suffer from emotional distress and has experienced anxiety attacks and difficulty with sleeping which have required her to seek counseling and therapy and to take Prozac. Finally, the plaintiff presented evidence from which the jury could conclude that a reasonable person would have suffered emotional distress under the circumstances of this case. The Town’s motion for judgment nothwithstanding the verdict is DENIED with respect to the claim of negligent infliction of emotional distress.
Loss of Consortium
The Town also challenges the awards made by the jury for loss of consortium. In Massachusetts, a parent of a minor child has a statutory claim for loss of consortium to recover for the loss of society and companionship caused by the negligent injury of the child. M.G.L.c. 231, §85X. Massachusetts courts have also recognized a child’s right to recover for loss of a parent’s society and companionship through a defendant’s negligence if the child is a minor who depends on the parent both economically and in filial needs for closeness, guidance and nurture. See Ferriter v. Daniel O’Connell’s Sons, Inc., 381 Mass. 507 (1980). A claim for loss of consortium stands on its own, separate and distinct from the cause of action of the person seeking compensation for injury. See Feltch v. General Rental Co., 421 N.E.2d 67, 71 (1981) (holding that wife’s recovery for loss of consortium should not be reduced by the proportion of negligence attributable to husband, because claim for loss of consortium is independent of the damages claim of the injured spouse); Pinheiro v. Medical Malpractice Joint Underwriting Assoc. of Mass., 406 Mass. 228 (1989) (holding that plaintiffs claim for loss of consortium is separate and distinct from spouse’s malpractice claim for purposes of applying insurance policy limitations); 17A RICHARD W. BISHOP, MASSACHUSETTS PRACTICE, PRIMA FACIE CASE — PROOF AND DEFENSE §43.3 (4th ed. 1997). A loss of consortium claim requires proof of a tortious act that caused the prerequisite injury of the person seeking compensation for injury. See Sena v. Commonwealth, 417 Mass. 250, 264 (1994) (holding that as a general rule a claim for spousal loss of consortium requires proof of a tortious act that caused the claimant’s spouse personal injury); 17A BISHOP, MASS. PRACTICE §43.3. Furthermore, the consortium claimant must litigate the issue of fault and prevail against common law defenses. See Ferriter, 381 Mass. at 529. Basic principles of tort law and negligence require a loss of consortium claimant to establish that the negligence of the defendant caused injury to the primary claimant, and that that injury in turn caused the loss of consortium to the consortium claimant.
The case presently before the court requires independent examination of four separate loss of consortium claims. The first claim is Ms. Lamare’s claim of loss of consortium with Demetra. Ms. Lamare’s claim of loss of consortium with her daughter Demetra requires proof that the Town’s negligence caused Demetra emotional distress, and that this emotional distress in turn caused Ms. Lamare’s loss of consortium with Demetra. As previously discussed, the jury’s verdict of negligent infliction of emotional distress for Demetra does not survive a motion for judgment notwithstanding the verdict because Ms. Lamare did not present evidence from which a reasonable jury could conclude that Demetra suffered from emotional distress. In the absence of proof of any injury to Demetra, there is no need to proceed to the latter portion of the analysis. Ms. Lamare’s claim of loss of consortium must fail because the prerequisite injury to Demetra has not been proven. See id. Therefore, the Town’s motion for judgment notwithstanding the verdict as it pertains to Ms. Lamare’s claim for loss of consortium with Demetra is ALLOWED.
The second claim is Demetra’s claim of loss of consortium with Ms. Lamare. A child may recover for loss of a parent’s society and companionship through a defendant’s negligence if the child is a minor who depends on the parent both economically and in filial needs for closeness, guidance and nurture. See Ferriter, 381 Mass. at 517. The child’s claim is separate and *449 distinct from the loss incurred by the parent. See Pinheiro, 406 Mass. at 230. To establish a loss of consortium claim, a child must demonstrate that the defendant’s acts caused injury to the primary claimant and that that injury in turn caused the consortium claimant to lose the services, love, affection and companionship of the parent. See 17A BISHOP, MASS. PRACTICE, §43.3. By way of analogy, it is helpful to consider the classic example of loss of consortium; a husband is negligently injured by a third party and those injuries cause a loss of consortium with his wife. In that case, the wife’s loss of consortium claim requires proof that the third party’s negligent act caused the injury to her husband, and that the negligently inflicted injury was the legal cause of the wife’s loss of consortium.
Applying the analogy to the case presently before the court, Demetra must prove that the Town’s negligent act caused injury to her mother and that her mother’s injury was the legal cause of Demetra’s loss of consortium with her mother. In this case, Demetra has been separated from her mother for several years. However, that loss of her mother’s society was not caused by the emotional distress negligently inflicted upon her mother by the Town. Demetra’s loss of her mother’s society was a direct result of Demetra’s abduction, and was not caused by Ms. Lamare’s emotional distress injuries. For this reason, Demetra’s loss of consortium claim must fail. The Town’s motion for judgment notwithstanding the verdict as it pertains to Demetra’s claim of loss of consortium with Ms. Lamare is ALLOWED.
The third claim is Ms. Lamare’s claim of loss of consortium with Ellas. Ms. Lamare testified that, in the months following her return home, Ellas had trouble sleeping at night and would wake up screaming. Ellas’s therapist testified that Ellas suffered from posttraumatic stress disorder and required psychological care and treatment for several years. In short, there was ample evidence from which a reasonable jury could conclude that the Town’s negligence caused Ellas’s emotional distress injuries, and that those injuries in turn caused Ms. Lamare to suffer the loss, to some degree, of the companionship and society of her daughter. Therefore, the Town’s motion for judgment notwithstanding the verdict as it pertains to Ms. Lamare’s claim of loss of consortium with Ellas is DENIED.
The fourth claim is Ellas’s claim of loss of consortium with Ms. Lamare. Ms. Lamare testified that she suffered anxiety attacks, has had difficulty sleeping, and that the matter of the abduction “pulls at” her constantly. She testified that she has taken Prozac, and has undergone counseling and therapy. In short, there was ample evidence from which a reasonable jury could conclude that the Town’s negligence caused Ms. Lamare’s emotional distress injuries, and that those injuries in turn caused Ellas to suffer the loss, to some degree, of the companionship and society of her mother. Therefore, the Town’s motion for judgment notwithstanding the verdict as it pertains to Ellas’s claim of loss of consortium with Ms. Lamare is DENIED.
ORDER ON THE MOTION
The court hereby orders the following:
Motion for judgment notwithstanding the verdict as it pertains to causation is DENIED.
Motion for judgment notwithstanding the verdict as it pertains to specific and explicit assurances is DENIED.
Motion for judgment notwithstanding the verdict as it pertains to reliance is DENIED.
Motion for judgment notwithstanding the verdict as it pertains to the presentment letter is DENIED.
Motion for judgment notwithstanding the verdict as it pertains to Demetra Voulgarelis’ emotional distress claim is ALLOWED.
Motion for judgment notwithstanding the verdict as it pertains to Cheryl Lamare’s claim for loss of consortium with Demetra Voulgarelis is ALLOWED.
Motion for judgment notwithstanding the verdict as it pertains to Demetra Voulgarelis’ claim of loss of consortium with Cheryl Lamare is ALLOWED. Motion for judgment notwithstanding the verdict as it pertains to Cheryl Lamare’s claim of loss of consortium with Ellas Voulgarelis is DENIED.
Motion for judgment notwithstanding the verdict as it pertains to Ellas Voulgarelis’s claim of loss of consortium with Cheryl Lamare is DENIED.
ORDER FOR JUDGMENT
Judgment shall enter without interests and costs for Ms. Lamare in the amount of $100,000.00. Judgment shall enter without interests and costs for Ellas in the amount of $100,000.00.

The jury awarded a total of $9 million to the plaintiffs which is broken down as follows:
To Ms. Lamare $1,500,000 for emotional distress; $2,500,000 for loss of consortium as related to Demetra; $500,000 for loss of consortium as related to Ellas; $500,000 for expenses incurred.
To Ellas Voulgarelis $ 1,500,000 for emotional distress and $500,000 for loss of consortium as related to Ms. Lamare.
To Demetra Voulgarelis $500,000 for emotional distress and $1,500,000 for loss of consortium as related to Ms. Lamare.

This court notes that after hearings on this motion were conducted, the Town’s counsel drew to the court’s attention N.Y. Criminal Procedure LAW §570.34 (McKinney 1998) in support of the Town’s position that New York law permits a warrantless arrest only where the accused stands charged with a felony in the courts of another state. After careful review of the relevant New York statute and cases, it appears that New York authorities would have been authorized to detain Mr. Voulgarelis had the Town notified them and provided them with the information developed through the Town’s investigation. People v. Ormsby, 241 N.Y.S. 225, 227-28 (1930); People v. Wallace, 466 N.Y.S.2d 150, 154-55 *450 (1983). Based on the evidence presented by Sergeant Larkham with respect to the stop and hold procedures, the jury were warranted in concluding that the New York authorities would somehow have interdicted Mr. Voulgarelis and prevented his departure from the United States.