Locke, Jeffrey A., J.
The plaintiff, Francisco Yepes (“Yepes”), brought this negligence action seeking to recover for injuries he suffered after a fall at a construction site where he was working for his employer, New England Architectural Finishing Company, LLC (“NEAF”). Defendant C.H. Newton Builders, Inc. (“C.H. Newton”) was the general contractor at the same construction site, defendant Classic Structures Contracting, LLC (“Classic Structures”) was Newton’s subcontractor, and defendant C. Edward Gugler (“Gugler”) was an employee of Classic Structures (collectively, “defendants”). This action is before the court on the defendants’ motions for summary judgment. For the following reasons, the motions are ALLOWED.
BACKGROUND
The facts as revealed by the pleadings and materials submitted by the parties are as follows.[2] At the time of the accident, Yepes was employed by NEAF, a high-end woodwork restoration and finishing company. In early 2009, NEAF was referred to do woodwork on a large-scale home renovation at 4 McCall Road in Winchester, Massachusetts. NEAF’s owner, Mustafa Murat Oztermiyeci (“Oztermiyeci”), toured the *329 property and reviewed the project before producing a written proposal, dated February 2, 2009. Pursuant to that proposal, the property owner, Raffi Festekjian (“Festekjian”), hired NEAF to strip and refinish the woodwork in his home. Although NEAF’s proposal is in writing, the parties executed no other written contract, relying instead on a handshake.
Approximately five months later, on June 9, 2009, Festekjian entered into a contract with C.H. Newton (the “C.H. Newton Contract”),[3] a custom home builder, pursuant to which C.H. Newton was to serve as general contractor for “major renovations and addition to the Festekjian Home.” C.H. Newton Contract, p. 1. The C.H. Newton Contract also provided that “(t]he ’’Owner reserves the right to perform construction or operations . . . with the Owner’s own forces, and to award separate contracts in connection with other portions of the Project,[4] or other construction or operations on the site." Id. at §6.1.1 (emphasis added). The C.H. Newton Contract then addressed the parties’ separate roles and liabilities in such situations. If Festekjian, as owner, chose to exercise his right to use his “own forces,” the C.H. Newton Contract stated that “the Owner shall be deemed to be subject to the same obligations and to have the same rights that apply to the Contractor under the Conditions of the Contract, including . . . those stated in Article 3, this Article 6 and Articles 10, 11 and 12.”[5] Id. at §6.1.4. If Festekjian exercised his right to award “separate contracts,” the C.H. Newton Contract stated that “the term ‘Contractor’ in the Contract Documents in each case shall mean the Contractor who executes each separate Owner-Contractor Agreement.” Id. at §6.1.2.
The C.H. Newton Contract imposed upon the “Contractor” (meaning, under this contract, C.H. Newton) a number of general duties, including selecting, hiring and supervising subcontractors, as well as oversight of subcontractors’ workmanship and safety. Two specific provisions are relevant here. First, that “(t]he Contractor shall supervise and direct the Work, using the Contractor’s best skill and attention. [And] [t]he Contractor shall be solely responsible for, and have control over, construction means, methods, techniques, sequences and procedures . . .” Id. at §3.3.1. Second, that “[t]he Contractor shall take reasonable precautions for safety of, and shall provide reasonable protection to prevent damage, injury or loss to . . . employees on the Work and other persons who may be affected thereby[.]” Id. at §10.2.1.
C.H. Newton subcontracted with Classic Structures and its employee, Gugler, to perform the duties of site supervisor on the renovation.[6] As site supervisor, Gugler was tasked with ensuring the project moved along. This included being on the work site every day and giving instructions to C.H. Newton’s subcontractors, such as the days workers could be on the job site and when to show up for work. Gugler also resolved scheduling conflicts between the various contractors and subcontractors. Gugler, Festekjian, the architect, and representatives from C.H. Newton held weekly progress meetings at the work site at which they discussed the renovation’s progress, plans for the next few weeks, outstanding issues, and decisions that needed to be made. The group also assigned responsibilities, and produced a schedule. No NEAF representative attended these meetings.
NEAF’s work at the property lasted approximately four to five months, through the summer and fall of 2010. During this period, Oztermiyeci discussed scheduling with the defendants, but no one from C.H. Newton or anyone working at its direction provided instruction to Oztermiyeci or NEAF’s employees about how to do their work. Oztermiyeci testified that C.H. Newton had no control over NEAF’s work; rather, NEAF and its employees were responsible for the means and methods of their work.
The plaintiff testified that he thought NEAF was working for C.H. Newton. Another NEAF employee, German Zambrano (“Zambrano”) saw Gugler on the job site each day, but Gugler never told him how to do his work. Gugler never told Zambrano what NEAF should be doing or what the next step would be on the job, nor did Gugler tell Zambrano when to be on the job. Instead, Zambrano took direction from Oztermiyeci, who was “the one who ma[de] all the decisions.” Zambrano Depo., 62:13-14. Notwithstanding this, Zambrano did think that Gugler was “in charge of the job.” Id. at 89:14-17.
Yepes’ injury occurred on September 7, 2010. That morning, Yepes and Zambrano moved NEAF’s woodworking equipment, including a scaffold, from the third floor of the property to the first floor, where they were to work that day. Yepes and Zambrano assembled the scaffold together on the first floor. The floor was covered with plastic and water resistant paper for protection. NEAF usually covers the floor in this manner when it performs woodworking, in order to protect the floor. Yepes screwed in and locked the wheels on the scaffold, which was placed about one foot away from the wall. He then climbed up onto the scaffold, stood on its platform, and started sanding work on the ceiling.[7] Yepes worked at the sanding for a few minutes. The scaffolding then moved suddenly, and Yepes fell about eight feet to the ground. The scaffolding fell onto its side, on top of Yepes’ leg. Yepes suffered a fractured ankle. Zambrano was in the room at the time. He did not witness the fall, but turned around once Yepes was already on the ground. Zambrano helped Yepes up off the floor and righted the scaffolding. Gugler, having heard the noise of the fall from outside, came into the room. Oztermiyeci was not at the work site at the time of the fall, but headed over once notified. Yepes ultimately was driven to the hospital by another NEAF employee, Juan Carlos Arango (“Arango”).
*330 As a result of his fall, Yepes suffered physical pain and injuiy and incurred associated medical expenses. Yepes also alleges that he has suffered great loss in earning and potential income. In May 2012, Yepes filed this suit, asserting one count of negligence against each defendant. In May 2014, C.H. Newton, separately, and Classic Structures and Gugler, jointly, moved for summary judgment.
DISCUSSION
I. Standard of Review
Summary judgment is granted where there are no genuine issues of material fact and where the moving parly is entitled to summary judgment as a matter of law. Mass.R.Civ.P. 56(c); Cassesso v. Commissioner of Corr., 390 Mass. 419, 422 (1983); Community Nat’l Bank v. Dawes, 369 Mass. 550, 553 (1976). The moving party bears the burden of demonstrating affirmatively the absence of a triable issue. Pederson v. Time, Inc., 404 Mass. 14, 16-17 (1989). If the moving party does not bear the burden of proof at trial, it must either submit affirmative evidence negating an essential element of the non-moving party’s claim or demonstrate that the non-moving party’s evidence is insufficient to establish its claim. Kourouvacilis v. General Motors Corp., 410 Mass. 706, 711 (1991). Mere assertions of the existence of disputed facts without evidentiary support cannot defeat a summary judgment motion. LaLonde v. Eissner, 405 Mass. 207, 209 (1989). In deciding a motion for summary judgment, the court may consider pleadings, depositions, answers to interrogatories, admissions on file, and affidavits. Mass.R.Civ.P. 56(c); Dawes, 369 Mass. at 553. The court reviews the evidence in the light most favorable to the nonmoving parly, but does not weigh evidence, assess credibility, or find facts. Attorney Gen. v. Bailey, 386 Mass. 367, 370-71 (1982).
II. Analysis
In a negligence suit, the plaintiff must prove that the defendant owed a duly of care, that the defendant breached this duty, that damage to the plaintiff resulted, and that there was a causal connection between the breach of duty and the damage. Lev v. Beverly Enterprises-Massachusetts, Inc., 457 Mass. 234, 239-40 (2010), quoting Jupin v. Kask, 447 Mass. 141, 146 (2006). Whether a party owes another a duty of care is usually a question of law for the court to decide. Id.
Yepes claims that the defendants owed a duty of care for supervision and safety to him as a worker at the job site, and that the defendants’ breach of this duty — specifically, their “inadequate control, supervision and monitoring of the job site” — caused his injuries. Amended Complaint, ¶¶9, 18, 27. The defendants argue that they cannot be held liable for negligence because they did not owe a duty of care to the plaintiff. The court agrees with the defendants.
A. Contractual Duty of Care
C.H. Newton first argues that its contract with Festekjian did not impose a duty of care as to those workers on the job site who were not subcontractors of C.H. Newton. The plaintiff does not dispute this assertion in his opposition to the defendants’ motions for summary judgment. In any event, the contract is clear that C.H. Newton owed no duty of care to NEAF or its employees.
There is no dispute here that NEAF was hired separately and directly by Festekjian, or that such an arrangement was permitted under §6.1.1 of the C.H. Newton Contract. The court need not decide whether NEAF is considered Festekjian’s “own forces” or is under a “separate contract,” since liability does not attach to C.H. Newton in either scenario. If the court determines that NEAF was employed as Festekjian’s “own forces,” §6.1.4 of the C.H. Newton Contract (“the Owner shall be deemed to be subject to the same obligations and to have the same rights that apply to the Contractor under the Conditions of the Contract”) provides that Festekjian as owner — not C.H. Newton— had a duty vis-a-vis NEAF to control NEAF’s construction means, methods, techniques and procedures, and to take reasonable safety precautions. Alternatively, if the court determines that Festekjian awarded NEAF a “separate contract,” §6.1.2 (“the term ‘Contractor’ in the Contract Documents in each case shall mean the Contractor who executes each separate Owner-Contractor Agreement”) provides that NEAF and C.H. Newton were under separate and distinct obligations to oversee their own work and to take reasonable safely precautions. The fact that NEAF’s contract with Festekjian was oral is irrelevant; neglecting to execute a written agreement does not thereby saddle C.H. Newton with a duty of supervision and safety. Accordingly, C.H. Newton owed no duty of care to NEAF or its employees pursuant to the contract and, under either the “own forces” or “separate contract” theory, the defendants cannot be held liable.
B. Duty of Care Under 454 Mass. Code Regs. §10.03(9)
In opposition to the defendants’ summaryjudgment motions, Yepes argues that the defendants are bound by a nondelegable duty of care for the overall safely of all persons on the job site under 454 Code Mass. Regs. §10.03(9). Section 10.03 sets out the general duties and responsibilities of an employer as to its employees’ safety.[8] Yepes points specifically to subsection (9), which provides that “[t]he prime contractor and any subcontractors may make their own arrangements with respect to obligations which might be more appropriately treated on a jobsite basis rather than individually ... In no case shall the prime contractor be relieved of overall responsibility for compliance with the requirements of this part for all work to be performed under the contract.” 454 Code Mass. Regs. §10.03(9) (emphasis added).
*331 The regulation, however, is inapplicable here. First, §10.03 applies in the context of the employer-employee relationship. Yepes was not an employee of C.H. Newton, Classic Structures, or Gugler. Second, subsection (9) specifically refers to “all work to be performed under the contract” C.H. Newton’s contract did not apply to the woodworking performed by NEAF. NEAF’s work was performed pursuant to its separate contract with Festekjian. For these reasons, the court finds that 454 Code Mass. Regs. §10.03(9) does not apply, and did not impose a duty of care for supervision of safety by any defendant.
C. “Retained Control” Theory of Duty of Care
All defendants further argue that they did not retain control of NEAF or Yepes’ work such that they assumed a duty of care to NEAF generally or Yepes specifically through their actions on the job site. Yepes argues that questions of material fact exist as to whether the defendants retained such control. The undisputed facts, however, reveal that no defendant acted in a way which indicated that they retained control over the plaintiffs work, and thereby assumed a duty of care for supervision or safety for the plaintiff.
Most cases involving injury to an employee at a work site arise in circumstances in which a general contractor is sued by the employee of one of its own subcontractors. This is not the case here. Nonetheless, analysis of the retained control duty of care theory developed in those cases is helpful. In Corsetti v. Stone Co., 396 Mass. 1 (1985), the plaintiff, an employee of a subcontractor, was injured on a work site. The plaintiff sued the general contractor, alleging negligent failure to require workers to use safety equipment. Corsetti, 396 Mass. at 3. The Supreme Judicial Court agreed, adopting §414 of the Restatement (Second) of Torts (1965), which states: “One who entrusts work to an independent contractor, but who retains the control of any part of the work, is subject to liability for physical harm to others for whose safety the employer owes a duty to exercise reasonable care, which is caused by his failure to exercise his control with reasonable care.” Corsetti, 396 Mass, at 10. See also Foley v. Rust Int'l, 901 F.2d 183, 184 (1st Cir. 1990). Moreover:
It is not enough that [the general contractor] has merely a general right to order the work stopped or resumed, to inspect its progress or receive reports, to make suggestions or recommendations which need not necessarily be followed, to prescribe alterations or deviations. Such a general right is usually reserved to employers, but it does not mean that the contractor is controlled as to his methods of work, or as to his operative detail. There must be such retention of a right of supervision that the contractor is not entirely free to do the work his own way.
Comment C, §414 of the Restatement (Second) ofTorts (1965). Whether a general contractor has sufficient control to be liable to a subcontractor’s employee is typically a question of fact for the jury. Id. at 11. It should not be determined on summary judgment unless, viewing the evidence in the light most favorable to the plaintiff, the undisputed material facts demonstrate, as a matter of law, that the defendant did not exercise any “meaningful control, however minimal, over the subcontractor.” Dilaveris v. W.T. Rich Co., 424 Mass. 9, 11 (1996).
The testimony of the witnesses clearly establishes that C.H. Newton retained no meaningful control over NEAF’s work. Paul Chaisson (“Chaisson”), as representative for C.H. Newton, testified that C.H. Newton’s duty as general contractor was to ensure the safety of its subcontractors, not of all workers on site. Chaisson Depo., pg. 22:8-15. Chaisson also explained that weekly project meetings were held on the work site, attended by himself, David Newton (of C.H. Newton), Gugler, Festekjian and the architect, at which attendees discussed progress and plans for the coming weeks, assigned responsibilities, and produced decision lists and a schedule. Id. at 46:2-15. No representatives from NEAF attended these meetings and there is no evidence — and the plaintiff does not claim — that any of these decisions affected NEAF’s work in any meaningful way.
Oztermiyeci testified that no one from C.H. Newton provided any direction to him or to any other NEAF employee as to “how to do the work.” Oztermiyeci Depo., pg. 50:7-17. Rather, Oztermiyeci testified that he and his employees were responsible for the “means and methods” of their work. Id. at 50:14-17. Oztermiyeci further clarified that neither C.H. Newton nor Gugler had any control over setting up the scaffolding at issue here or NEAF’s safety arrangements generally. Id. at 50:18-20; 56:7-15. Similarly, no one told Oztermiyeci or his employees when they could work; instead, Oztermiyeci coordinated his schedule with the other workers and trades on site, including Gugler. Id. at 72:2-12. When asked whether C.H. Newton or any of its representatives could tell a NEAF employee to stop doing something unsafe, Oztermiyeci stated that he “believe [d] [he] would accept that” for “safety.” Id. at 72:19-24; 73:1-2. Oztermiyeci clarified that he would do so because “we don’t want anybody to get hurt no matter what.” Id. at 73:8-9. But see Foley, 901 F.2d at 185 (discounting similar admission that general contractor could order subcontractor to stop work for safety reasons as evidence of control).
Zambrano testified that Oztermiyeci “tells [him] where to go and [he] let[s] the guys know where to go,” and that Oztermiyeci was “the one who makes all the decisions.” Zambrano Depo., 62:3-16. Zambrano also stated that Gugler never told him how to do his job. Id. at 67:4-6. Zambrano never witnessed Gugler tell anyone else on NEAF’s crew how to do their job, nor was he ever told that Gugler had done so. Id. at 67:7-14. Zambrano did see Gugler on the job site every *332 day, id. at 84:21-23, but Zambrano never told Gugler what NEAF was doing or what the next step was in NEAF’s work, nor did Gugler tell him what NEAF’s next step should be or when he would need NEAF generally or Zambrano specifically to be on the job. Id. at 85:8-14.
The evidence is clear that the only interaction between NEAF and Yepes, on one hand, and C.H. Newton and Gugler, on the other, was for general scheduling purposes.[9] Of course, different trades on a work site must coordinate their work schedules and locations of their work, lest they interfere with each other’s work. But to hold that a general contractor assumes a duty of care to other contractors on a work site merely through discussing scheduling goes too far. Not only are these conversations to be encouraged for everyone’s safety, they are not the type of “meaningful control” necessary to impose liability contemplated by Corsetti and its progeny. This is particularly true where the injured party is not a subcontractor but is separately employed by the property owner; even more where the separate contractor was hired before the general contractor, stripping the general contractor of all agency in choosing the corporations and individuals for which it will assume the risk of liability.
In his opposition memorandum, Yepes points out that Gugler “kept track of his time and billed Defendant C.H. Newton for site supervision.” Plaintiffs Opposition Memo at 5. NEAF’s work, however, was not the only work occurring in the work site that day. Thus, Gugler’s billing is not evidence that he was supervising NEAF or its employees specifically. Compare Kostrzewa v. Suffolk Constr. Co., 73 Mass.App.Ct. 377, 380-81 (2008) (general contractor foreman billing for “Supervision, Safety, [and] Security” on a day when only the subcontractor’s work was being performed allowed inference that the foreman was performing his work specifically with regard to the subcontractor’s work).
It also is of no moment that C.H. Newton or Gugler were on the work site every day, or were walking around and observing the work, or retained the ability to stop the work. This, without more, is insufficient to show control giving rise to liability. See, e.g., Lyon v. Morphew, 424 Mass. 828, 835 (1997) (owner did not retain sufficient control over contractor to subject them to liability where they retained right to stop work but contractor provided workers, materials and technical expertise); Kelleher v. Brandeis Univ., No. 05-2933, 2008 Mass.Super. LEXIS 120, *10 (Mass.Super.Ct. 2008) (Kern, J.) [24 Mass. L. Rptr. 32] (owner performing walk-throughs of the project with abilily to stop work if contractor was in non-compliance with contract terms, by itself, was insufficient to show that “the contractor [was] not entirely free to do the work his own way”).
The undisputed facts here show, as a matter of law, that the defendants lacked any actual, meaningful control of NEAF or its employees. This, coupled with the C.H. Newton Contract’s separation of liability between NEAF (as either Festekjian’s “own forces” or under a “separate contract”),[10] demonstrates that C.H. Newton and Gugler did not retain control over NEAF or Yepes sufficient to give rise to a duly of care to the plaintiff. Because the court finds that no defendant owed a duty of care for supervision or safety under the terms of the C.H. Newton Contract, 454 Code Mass. Regs. §10.03(9), or by retaining control over NEAF’s work, summary judgment in the defendants’ favor is appropriate.
ORDER
For the foregoing reasons, it is hereby ORDERED that the defendants’ motions for summary judgment are ALLOWED.

The only potential dispute in the facts arises out of two eleventh-hour affidavits submitted by the plaintiffs brother, German Alberto Yepes Mora (“Mora”), and another NEAF employee, Juan Carlos Arango (“Arango”), dated March 22, 2014, mere weeks before the defendants’ summary judgment motions were submitted. The court declines to construe these affidavits as sufficient to put a fact issue in dispute because they are conclusoiy, not based on personal knowledge, and largely irrelevant. See MassR.Civ.P. 56(e) (“Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein”). Moreover, the affidavits directly contradict documentation in the record — such as the C.H. Newton Contract — and the sworn deposition testimony given by all other witnesses. The affidavits also lack indicia of reliability: though both statements purport to have been translated into Spanish for Mora and Arango, there is no identification of a translator or certification authenticating the translation. Therefore, the court does not construe the affidavits as creating a fact issue.

See C.H. Newton’s Joint Appendix and Index of Exhibits Pursuant to Superior Court Rule 9A(b)(5)(vi), Exhibit 3.

“The Project” is defined as “the total construction of which the Work performed under the Contract Documents may be the whole or a part and which may include construction by the Owner and by separate contractors.” C.H. Newton Contract, §1.1.4. “The Work” is defined as “the construction and services required by the Contract Documents, whether completely or partially completed, and includes all other labor, materials, equipment and services provided or to be provided by the Contractor to fulfill the Contractor’s obligations. The Work may constitute the whole or a part of the Project.” Id. at §1.1.3.

Article 3 is entitled “CONTRACTORS,” Article 6 is entitled “CONSTRUCTION BY OWNER OR BY SEPARATE CONTRACTORS,” Article 10 is entitled “PROTECTION OF PERSONS AND PROPERTY,” Article 11 is entitled “INSURANCE AND BONDS,” and Article 12 is entitled “UNCOVERING AND CORRECTION OF WORK.”

Classic Structures also performed some carpentry work.

There is some dispute as to the details ofYepes’ accident. For instance, disagreement exists over whether Yepes had already climbed up on the scaffolding or was simply adjusting the staging, or whether the platform had been placed on the scaffold or was missing The description included above is derived from Yepes’ own deposition testimony. In any event, *333 the details of Yepes’ accident are immaterial for the purposes of these summary judgment motions.

For example, the regulation requires that “[a]ll places where employees are directed or permitted to perform work of any kind in construction work or demolition work shall be so constructed, equipped, arranged, operated and conducted as to provide reasonable and adequate protection of the lives, health and safety of employees and others.” 454 Code Mass. Regs. §10.03(l)(a). The regulation also requires that “[ejmployers, owners, contractors, sub-contractors, superintendents or foremen in charge, and other persons obligated by law to adhere to the requirements of 454 CMR 10.00 shall not direct, or permit an employee to work under conditions which are not in compliance with or which are prohibited by 454 CMR 10.00.” Id. at §10.03(l)(b).

The only evidence to the contrary are statements made in the Mora and Arango affidavits. Specifically, Arango claims that, on one occasion, Gugler “didn’t like the work [NEAF was] doing with the front double doors,” and instructed NEAF employees to “change it,” Aranago Aff., pg. 1, and Mora claims that he “would see [Gugler and C.H. Newton] instructing [Oztermiyeci] and others on how to do their job or to stop doing something and do something else.” Mora Aff., pg. 1-2. As noted previously, the court does not construe these affidavits as creating a fact issue for their failure to comply with the requirements of Mass.R.Civ.P. 56(e). See Footnote 2 at pg. 1, supra. However, even if the court were to find certain statements in these affidavits admissible, they would still be insufficient to overcome summary judgment. The standard of retained control outlined in the Restatement is that “[i]t is not enough that [the general contractor] has merely a general right to order the work stopped or resumed, to inspect its progress or receive reports, to make suggestions or recommendations which need not necessarily be followed, to prescribe alterations or deviations.’’ Comment C, §414 of the Restatement (Second) of Torts (1965) (emphasis added). The assertions in the Mora and Arango affidavits fall within the ambit of this categorical exclusion. Arango’s statement regarding the front double doors, in particular, is insufficiently specific to create a question of material fact. Arango does not specify what Gugler wanted changed — only that he made a suggestion or prescribed an alteration. This falls short of showing that NEAF was not “entirely free to do the work its own way.” Thus, even considering the evidence in the affidavits in the light most favorable to the plaintiff, there remains no question of material fact.

Though the terms of the C.H. Newton Contract cannot vary or heighten any duty a contracting party may owe to a noncontracting party, they can be evidence of control. Corsetti, 396 Mass, at 11 n.8.